Bernard Marigny *v.* The Union Bank of Louisiana.

In an action against a corporation, based on alleged acts of fraud and deception, on the part of the directors, collectively and individually, evidence is admissible of the acts and declarations of individuals who were, at the time of such acts and declarations, directors, and concerned in the alleged fraud. Such acts and declarations, having been made before, and at the time of the transaction, are part of the *res gestæ*.

The voluntary execution of a contract, with the full knowledge of the grounds upon which it might be rescinded, amounts to a ratification of it, and involves a renunciation of the means and exceptions that might have been opposed to it.

Appeal from the Parish Court of New Orleans, *Maurian,* J.

Simon, J. The plaintiff represents, that on or about the month of March, 1839, Martin Gordon, Jr., being then Cashier of the Union Bank of Louisiana, acknowledged his indebtedness unto the said Bank, in a sum of $51,500, for which he furnished his four promissory notes, dated the 18th of March, 1839, to the order of,

and endorsed by, M. Gordon, Sen., and next endorsed by the petitioner, each for the sum of $12,875, bearing interest at the rate of seven per cent per annum, and made payable at twelve, fifteen, eighteen, and twenty-four months from date. That being in no way connected with the business and private transactions of the said Cashier, the petitioner was induced to endorse his notes by the consideration, proferred by the Bank, that the indebtedness of said M. Gordon was an honest and real one, and that the payment of the said notes would be guarantied, by substituting in their place other notes, which were to proceed from the sale of the said Cashier's property, which was to be effected at a short time, and to be realized so as to meet the maturity of said notes. That the petitioner was also induced to give his endorsements on said notes, by the most unequivocal and repeated assurances on the part of the Bank, that said Cashier would thereby be enabled to keep his office, which he held at that time, with a salary of $8000, which was to be applied to the redemption of the endorsements furnished by the petitioner, should it happen, that the property about to be sold would not produce a sufficient amount to cover the whole debt.; and that, had it not been for those considerations, he, plaintiff, would not have endorsed the notes of M. Gordon, Jr.

The plaintiff further states, that at the time he endorsed the notes, M. Gordon, Jr., to the knowledge of the President and Directors of the Union Bank, could not effect the sales contemplated, to an amount approaching that represented by the said notes ; and that, when the defendants allured him into the endorsement thereof, they knew full well the utter inability of said Gordon, Jr., to accomplish his promise, and also his absolute insolvency. He further avers, that although the said Bank exerted themselves to represent the indebtedness of their Cashier, as originating in a moral cause, or as created by a legal obligation, they did all this for the sole purpose of entrapping the petitioner into the responsibility which he assumed by his said endorsements ; and that they prepared themselves to dismiss their Cashier, as soon as the securities demanded should be obtained.

The petitioner further alleges, that by the ill and wicked practices of the Bank, by the fraud committed upon him, by their connivance with Martin Gordon, Jr., to screen him from what he con-

sidered a dangerous debt, by their suggestions, to impress the plaintiff with the idea and belief, that his endorsement was a mere nominal one, to be covered by the proceeds of the sale, which they knew could not effect it, and by the proferred assurances that said Cashier should keep his office, they induced him, (the complainant,) to become endorser on the said notes ; and that they have brought upon him the necessity of paying the same.

He further states, that in consequence of said necessity, thus brought upon him by the fraudulent, malicious, and wicked practices of the Union Bank, besides the amount which he has actually paid upon the notes, which, with the interest, are raised to $63,430 55, he has suffered damages in the sum of $50,000, and upwards ; which, having accrued to him out of the manœuvres, deceit, and fraud above stated, render the Union Bank liable for the same.    He prays judgment for the sum of $63,430 55, and also for $50,000 damages.

The defendants first pleaded the general issue, and specially denied the fraud and ill practices alleged by the plaintiff.   They further aver, that at the time the endorsements were given by the plaintiff, he knew the affairs of Martin Gordon, Jr. much better than the defendants, as he, and M. Gordon, Jr. and M. Gordon, Sen. were in the habit of constantly endorsing for each other, to very large amounts,    They also say, that the petitioner was one of the securities on the bond of M. Gordon, Jr., as Cashier of the Union Bank ; and they pray, that judgment may be rendered in their favor ; and further, that the plaintiff may be condemned to pay them $20,000 damages, for the defamation contained in his petition.

The defendants subsequently filed a supplemental answer, in which, after a renewed denial of the fraud, they state, that the plaintiff was fully acquainted with the liabilities claimed by the Bank from Gordon, and which the latter settled by his notes and mortgage on his property ; that, as a further consideration for his endorsements, the plaintiff was one of the Cashier's official sureties, for his said liabilities ; that said Cashier was justly liable to them, for losses sustained by the Bank, in consequence of his mismanagement of the funds of the Bank entrusted to his charge, as Cashier, by which there was a deficiency in said funds to the

Marigny v. The Union Bank of Louisiana.

amount of the notes for which Gordon was responsible, and for which he always acknowledged his liability, and which liability the plaintiff has repeatedly admitted, with a full knowledge of al l the circumstances, &c.

They further say, that in consideration of the loss of the plain - tiff, and to render it as light as possible, they took from him, in discharge of his endorsements before they were due, and at his solicitation, bonds of the New Orleans Theatre Company, whic h were greatly depreciated ; and that, if the plaintiff can rescind his transaction, as security and endorser, he could only recover back the bonds, and nothing else.   They further allege, that the plain- tiff required them to subrogate him to their recourse against M. Gordon, Sen., upon the notes by him endorsed, and to transfer to him their mortgrge, as given by Gordon, Jr. ; that said plaintiff always claimed the debt and mortgage as his own, and obtained a loan thereon from the Citizens Bank ; that he appeared in the case of *M. Gordon, Jr.* v. *His Creditors,* and claimed, under oath, said notes and mortgage as his property, and acted throughout as a creditor, and received a large dividend on the same.   Wherefore they allege, that as the plaintiff has made it impossible to return the notes and mortgage, he is not entitled to the remedy by him claimed ; and that, at all events, he can only obtain that remedy on the return of the sum by him received from the insolvent es- tate of M. Gordon, Jr., with interest, and of the notes of said Gor- don duly protested.   They pray as in their original answer.

Upon all these issues the case was tried by a jury ; who, after having received the written charge of the court, to which the counsel of the defendants excepted, on the ground, that the same was contrary to law, and calculated to mislead the jury, found and returned a verdict\ in favor of the plaintiff, for $42,869, and for $9,076 damages, making together a sum of $51,945 ; and, after an unsuccessful attempt to obtain a new trial, the verdict was made the judgment of the court, and the defendants appealed.

Our attention is first called to a bill of exceptions found in the record, by which it appears, that the testimony of S. Hiriart, in- troduced by the plaintiff as a witness to prove statements of cer- tain declarations made to him by Thomas W. Chinn, a Director of the Union Bank, on board of a steamboat, in relation to the dis·

missal of M. Gordon, Jr., as Cashier of the Bank, and to the know-
ledge which the Directors had of the causes of the deficit, was ob-
jected to by defendants' counsel, on the ground that they were
not the acts or the declarations of the defendants, or binding upon
them, and that the same was hearsay testimony ; but it was admit-
ted by the inferior court.   The same bill of exceptions embraces
also the same objections to the statement made by the witness, of
a conversation with C. Adams, the President of the Bank; also
to the statement by G. Preval, another witness, (then a Director,)
of conversation with Mr. Milligan and several Directors, as to the
necessity that M. Gordon should resign his office; and to the
proof by Preval, that when the board was trying to come to a
settlement with the Cashier, he was made to understand, that if
the settlement was made, he would be permitted to keep his
office.   This last statement was objected to, on the ground, that
no consideration of the settlement could be given in evidence,
which was not expressed in the settlement itself, the same being
in writing.

We think the Judge, *a quo*, did not err in permitting this testi-
mony to go to the jury.   The declarations offered in evidence
were made by persons who were, at the time they were made,
Directors of the Union Bank ; they were parties to the act com-
plained of by the plaintiff, who, under the allegations of his peti-
tion, is clearly entitled to show, not only the acts and proceedings
of the whole board of Directors, but also the general course of
conduct, declarations, and even expressed intentions of each Di-
rector, in relation to the transaction which they then had in view,
to secure the recovery of the amount said to have been lost acci-
dentally by their Cashier.   This action being based upon alleged
acts of fraud and deception on the part of the Directors of the
Bank, not only collectively, but also separately, and upon contri-
vances on their part to induce the plaintiff to endorse the notes
which were to be given by M. Gordon, Jr., it is obvious, that it
would be very difficult, if not impossible, to establish the fraud,
if any did exist, if the complainant was not permitted to produce
witnesses able to disclose the acts, doings, and declarations of the
individuals who, as Directors, had a hand in the fraudulent means
alleged to have been used to the prejudice of the plaintiff, and

by which his endorsements were procured. Those declarations may, perhaps, be considered as a part of the *res gestæ*, since they were made before, and at the time that the transaction took place. We are not prepared to say, that the evidence offered should have been rejected.

Our next inquiry is, not only into the legality of the written charge of the court to the jury, which, as we have already said, was regularly excepted to by the defendants' counsel, but also into a bill of exceptions taken to the refusal of the inferior Judge, to charge the jury as requested by said counsel; but before expressing our views upon the questions of law presented by the exceptions, it will be proper to advert to some of the facts established by the evidence, without, however, expressing any opinion upon their legal effect.

It appears by the evidence, that some time in the latter part of the year 1838, Martin Gordon, Jr., then Cashier of the Union Bank of Louisiana, forwarded to two of its branches three packages, containing together a sum of $61,500, which, according to his statement, were sent by the post-office, into which, he says, that he put them *in person*. Those packages, to wit: one of $15,000, sent to the branch at St. Martinsville, on the 15th of November, 1838; another of $8000, to the same branch; and another of $38,500, to the branch at Natchitoches, sent on the 15th of December, never reached their destinations, except a sum of $10,000 contained in a package, which was received by the Cashier of the St. Martinsville branch. In the beginning of the year 1839, the deficit was discovered, amounting to $51,500, and explained by the Cashier in the manner above stated. This appears to have been taken for granted by the board of Directors, as nothing shows that any information was ever taken from the post office, or any other source ; or that any exertions were used to ascertain, whether the packages had ever been mailed and forwarded, and the direction, taking the Cashier's word for it, appeared to consider the deficit in their dealings with him, as the result of an accident. On the 18th of March, however, (here it is meet for us to observe, that we think it our duty to abstain from giving any statement of, or adverting in any manner, to the facts of fraud and deception attempted to be established or rebutted by

the parol evidence adduced by the parties, such matters being
foreign to the present question,) the board adopted a resolution,
appointing a committee of three to confer with the Cashier on the
subject of the remittance of money to the branches, and to report
on the cause which may have occasioned the deficit ; and on the
19th, a report was made, stating that information had been taken
from the Cashier, who, thinking that the different circumstances
would have an effect to injure his character, and cast some doubts
upon his integrity, *had offered to pay the Bank the whole amount
of the loss*, in notes to the order of his father, *by him endorsed, and
by the plaintiff*, payable in equal sums, at twelve, fifteen, eighteen,
and twenty-four months, binding himself to dispose of sufficient
property, to an amount equal to the sum due ; the notes proceed-
ing from the sale to be endorsed by himself, his father, and the
plaintiff, and to be substituted in lieu of those already given.
The committee, without expressing, as they say in their report,
any positive opinion on the causes of the occurrence, recom-
mended to the board, the propositions offered by the Cashier.
Four notes of $12,875 each, dated 18th of March, 1839, drawn
by Martin Gordon, Jr., and endorsed by his father and the plain-
tiff, were accordingly delivered to the Bank. On the 23d of
March, a resolution was adopted by the board, in consequence of
a letter from M. Gordon, Jr., stating, that he had been informed
by a person unconnected with the institution, that it was the in-
tention of the direction to remove him from the office of Cashier,
on account of the loss of $51,500 ; in which it is resolved, " that
the President be requested to inform the Cashier *that no decision
of that kind has been made*, or *any motion to that effect been pre-
sented to the board."* On the 9th of April following, a letter hav-
ing been received by the board from M. Gordon, Jr., in which the
latter tenders his resignation, the same was accepted, and the
direction passed an unanimous resolution, " *that their confidence
is unimpaired in the honor and integrity of Martin Gordon, Jr.,
and that they fully acquit him of all suspicion arising out of this
transaction, calculated to attach suspicion to his integrity."* On
the 28th of June ensuing, an act of mortgage was executed by M.
Gordon, Jr., in favor of the Union Bank, on certain property, to
secure the payment of the notes, with the stipulation that said

Marigny v. The Union Bank of Louisiana.

property should be disposed of by a sale thereof, according to the obligor's original propositions.

On the 12th of March, 1840, the plaintiff made a proposition to the Bank, offering to settle the amount of his endorsements on the four notes of M. Gordon, Jr., by transferring to the board, bonds of the Orleans Theatre Company. On the 21st of the same month, the first of the four notes was protested. On the 29th of April ensuing, the propositions of the plaintiff, for the settlement and withdrawing of the notes, were accepted and executed, and an act of subrogation was passed in favor of the plaintiff, subrogating him to the mortgage given by Gordon on the 28th of June, 1839 ; and the notes were delivered to him for the bonds of the New Orleans Theatre Company. On the same day, Marigny gave the said four notes, and the subrogation in pledge to the Citizens Bank, for the loan of a sum of money ; and on the 13th of May, 1841, the Union Bank took a mortgage on some of the plaintiff's property, to secure a loan of $21,500 made to him. The evidence shows also, that the plaintiff appeared at the meeting of Gordon's creditors, to claim the amount of the four notes ; and that he received subsequently, a sum of $11,853 26, as a dividend proceeding from the insolvent estate of said Gordon.

From the issues presented by the pleadings, and from the evidence contained in the record, several questions of fact were submitted to the jury, under the application of certain principles of law, upon which they were instructed by the court. The facts of fraud, deception, or error, which were in issue between the parties, were peculiarly within the province of the jury ; and their verdict, according to the well established jurisprudence of this court, if resting exclusively on their finding of those facts, would not perhaps be disturbed by us, unless clearly and manifestly erroneous. But the decision of this case depended also, upon a correct application of the law to the facts ; and, as the jury could only derive their knowledge of the law from the instructions of the court, it becomes our duty to examine if, either in the charges given by the Judge, or in his refusing to charge as requested by the counsel of the parties, any error has been committed.

We have attentively examined the written charge of the inferior Judge to the jury, and have been unable to discover therein,

any thing to which any valid, or well founded exception could be made. It is, in our opinion, so far as it goes, a clear, and correct exposition of the law, under which the jury was undoubtedly enabled to come to an exact conclusion on the issues of consideration, error, and fraud, presented by the pleadings ;* and were

---

* The Judge of the Parish Court charged the jury :

"That an obligation without a cause, or with a false or unlawful cause, can have no effect. Civil Code, art. 1887. That the cause is illicit, when it is forbidden by law, when it is *contra bonos mores*, (contrary to moral conduct,) or to public order. Ib. art. 1889. That by the cause of a contract, is meant the consideration or motive for making it ; and a contract is said to be without a cause, whenever the party was in an error, supposing that which was his inducement to exist, when, in fact, it never existed, or had ceased to exist before the contract was made. Civil Code, art. 1890. That he who has paid through mistake, believing himself to be a debtor, may reclaim what he has paid. Ib. art. 2280. That a thing not due, is that which is paid on the supposition of an obligation which does not exist. Ib. art. 2282. That the payment from which one might have been relieved by an exception that would extinguish the debt, affords ground for claiming restitution. Ib. 2284.

"That applying the evidence to these principles, the jury will examine what was the consideration for which the notes of Gordon, endorsed and paid by the plaintiff, and the amount of which is now reclaimed, were given ; and, secondly, whether that consideration was real and lawful. That the consideration for which the notes were given, is acknowledged on both sides to have been a sum of money due by Martin Gordon, Jr., Cashier of the Union Bank, to the said Bank, for a deficiency in his cash ; and that to ascertain whether that consideration was real and lawful, and, therefore, binding on the plaintiff, the jury will have to inquire into the cause of the deficiency.

"Was it the result of an embezzlement, by Gordon, of the funds of the Bank ? Was the result of a loss by neglect or accident ?

"That, in the first case—if the deficiency was the result of an embezzlement, by Gordon, of the funds of the Bank, and the fact was within the knowledge of the parties, and the contract was entered into for the purpose of avoiding a prosecution, the consideration would be unlawful and without effect. That, in the second case—if the deficiency was the result of neglect on the part of Gordon, or of accident, the jury will inquire what was the real cause—accident, or neglect. That, if neglect, it was a consideration which would give rise to a contract binding on Gordon, as well as on the plaintiff. That, if accident, the nature thereof may be inquired into by the jury ; and that, as no other accident has been alluded to in argument, than the loss of certain packages of bank notes, transmitted by Gordon to the branches of the Union Bank

this part of the case the only subject of our investigation, our duty should, perhaps, be limited to the inquiry, whether the jury made

in the country, the jury may inquire in what way, and by what conveyance the bank notes were transmitted—whether by the usual and ordinary one, and such as prudent men generally resort to ; whether any special mode of transmission had been fixed by the rules and orders of the Bank ; and whether, in the adoption of the mode resorted to, Gordon exercised a sound discretion? That, in examining those circumstances, if the jury should find, that Gordon was justifiable in adopting the mode resorted to, or, in other words, that if he so acted in the transmission of the said bank notes, that the Union Bank could not have held him responsible for their loss, then the accident or loss would not form a consideration for an obligation on the part of Gordon, and, consequently, on the part of the plaintiff. That, from the above authorities and reasoning, the jury will determine whether there was, or was not, a real and lawful cause for the obligation of the plaintiff towards the defendants.

" That the plaintiff, moreover, founds his action upon the ground, that there was error of fact on his part, and fraud on the part of the defendants. That the legal provisions, applicable to this branch of the case, are to be found in arts. 1813, 1814, 1815, 1816, 1817, 1818, 1819, 1820, 1821, 1822, 1823, 1824, 1825, 1826, 1841, and 1842 of the Civil Code.

" That, under the above authorities, if the plaintiff, in the transaction which has given rise to this suit, contracted under the impression and belief, that there had been no malpractice on the part of M. Gordon, Jr.—that his, plaintiff's, endorsements would be withdrawn, and the notes be paid with the proceeds of Gordon's property—that Gordon would preserve his office of Cashier, so as to enable him to pay the notes endorsed by the plaintiff, and the contrary was the case, then he may be said to have contracted in error. That, if the defendants created or continued the above belief and impression, with an intention or design of obtaining the endorsement of the plaintiff, and thereby procured an unjust advantage for themselves, it was what the law qualifies as a fraud. And that, in either case, the obligation was null and void, or, at least, voidable.

" That it follows, from what precedes, that if the jury find either, that no real and lawful consideration was given for the notes endorsed by the plaintiff, or that there was error on the part of the plaintiff, or fraud on the part of the defendants, the plaintiff was not bound to pay them ; and that, having paid them, according to the articles of the code above cited, he is entitled to recover back what he so paid.

" That, with regard to the damages claimed by the plaintiff, if the jury should find that the defendants were not guilty of fraud or bad faith, they can allow only such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties, at the time of the con-

a proper application of the law, to the facts disclosed by the evidence.

But the record contains a bill of exceptions, to the court's refusing to charge the jury as requested by the defendants' counsel. As to the refusal first complained of, we think the Judge, *a quo*, did not err; but as to the second, we are of opinion, that the jury was misinstructed, and that the law upon which the charge was refused, was clearly called for by the pleadings, and by the general state of the case.

It is necessary to state, that one of the grounds of defence, and a very important one too, urged by the defendants' counsel before us, and, as it appears, by the bill of exceptions, insisted on in the lower court, is, that even supposing, that the plaintiff's endorsements were obtained through error on his part, and fraud and deception on the part of the defendants, sufficient to vitiate, and annul his contract or obligation, he is precluded from alleging such error, and fraud, as grounds of nullity, as he voluntarily contracted, and executed his said obligation; after having acquired a full, and complete knowledge of all the facts, and circumstances which preceded, attended, and followed the discovery, and existence of the deficit, and of the causes which occasioned it. Hence, the question occurs, did the plaintiff contract with his eyes open? or rather, did he voluntarily execute his obligation, after having been made aware of all the preceding facts and circumstances, under which it was contracted? This question, merely one of fact, before being answered by the jury, requires, that they should be instructed, that " *the voluntary execution of an obligation amounts to a ratification of the contract, and involves a renunciation of the means and exceptions, that might be*

---

tract. That interest may probably be, in such a case, the sort of damages to be allowed.

" That if, on the contrary, the jury should find, that the defendants acted in fraud or bad faith, they are justifiable in finding, not only such damages as were, or might have been foreseen at the time of making the contract, but also such as they shall consider to have been the immediate and direct consequence of the breach of the contract."

*opposed to it.*" This is the purport of the 3d paragraph of the art. 2252, of the Civil Code ; and on this point, the defendants' counsel having requested the court to charge the jury according to said article, and to instruct them, " that if Bernard Marigny, entered into an obligation to the Bank in error, but voluntarily executed it, after a full knowledge of all the circumstances connected with the transaction, he could not then rescind it." The Judge, *a quo*, refused to give the charge required, read the art. 2252, to the jury, and charged them, that it had no application to the case before them. In this, we think, he erred.

The 2252d art. of our Civil Code, was borrowed from the Napoleon Code, and corresponds *verbatim* to art. 1338, of the latter. Toullier, upon this article, repulses the idea, that the voluntary execution of an obligation based upon a false cause, should not be considered as a renunciation of the means of obtaining its nullity ; and he says, it is certain, and gives it as his opinion, that " *l'exécution volontaire de l'obligation sans cause, laquelle n'est autre chose qu'une ratification tacite, est une renonciation à opposer le vice de cette convention, pourvu que la fausseté de la cause fût connue au moment de l'exécution volontaire.*" Vol. 6. No. 180. Duranton, Vol. 13, Nos. 177, 280, 281, 282. Merlin, *verbo* Lesion, § 6, says :   " *La nullité d'un acte, lorsqu'elle n'est pas absolue et d'ordre public, se couvre par l'exécution volontaire, que donne à cet acte, une partie qui, le connaissant, est à portée d'en faire prononncer l'annullation* " See also, *verbo* Ratification, No. 9. Toullier, again, Vol. 8, Nos. 506, 507, says : " *Ainsi l'exécution volontaire d'un contrat, le lendemain du jour où la violence a cessé, le lendemain du jour où l'erreur, ou le ·dol ont été découverts, emporte la renonciation aux moyens et exceptions que l'on pouvait opposer contre cette obligation.*" As to the proof of knowledge, we are ready to adopt Merlin's opinion, *loco citato, verbo* Ratification, who holds, that in order to show, that a contract has been ratified by its voluntary execution, it is necessary, that the obligee should prove, that the obligor had, when he executed it, full knowledge of the defect, for which it could be annulled. " *Autrement*" says he, " *et à défaut de cette preuve, elle (la partie obligée) est censée ne l'exécuter que parce qu'elle en ignore le vice.*" These principles of law are very clear, and are

perfectly concordant with the spirit, and even letter of our own laws ; and it seems to us, that under the pleadings and evidence of this case, the art. 2252, of the Civil Code, was applicable ; that is to say, that on the position taken by the defendants' counsel, that the plaintiff had ratified the obligation by him contracted, by voluntarily executing it, after having acquired a full knowledge of the grounds upon which it could be rescinded, it was the duty of the Judge, *a quo*, to instruct the jury, that if under the evidence they were of opinion, that the plaintiff had contracted the obligation under consideration, in error, or through fraud, and deception on the part of the defendants, but that when he executed it by a voluntary payment, he had a full knowledge of all the circumstances connected with the transaction, this should be considered by them as a ratification sufficient to prevent its being rescinded, and as a renunciation of the means, and exceptions which he might have opposed to the recovery of the money by the defendants ; and that if so, the plaintiff cannot recover it back.

With this view of this part of the inferior Judge's charge to the jury, we deem it unnecessary to examine any other branch of the case on its merits, as it must be remanded to the lower court, to be tried *de novo*.

It is, therefore, ordered and decreed, that the judgment of the Parish Court be annulled, and reversed, the verdict set aside, and that this cause be remanded to the court below for a new trial, with instructions to the Judge to charge the jury, in addition to the charges left undisturbed, according to the legal principles set forth, and recognized in this opinion. The costs of this appeal to be borne by the plaintiff and appellee.

*Soulé* and *Roselius*, for the plaintiff.

*H. R. Denis*, for the appellants.