No. 3554

Second Circuit

(Second Division)

———

CREDIT ALLIANCE CORP. v. CENTE-
NARY COLLEGE OF LA.

———

(July 16, 1931.  Opinion and Decree.)

———

Thatcher, Browne, Porteous & Myers, of Shreveport, attorneys for plaintiff, appellant.

Barnette & Roberts, of Shreveport, attorneys for defendant, appellee.

TALIAFERRO, J. On May 2, 1924, I. M. Clark, bursar of Centenary College of Louisiana, signed a written contract with the Grid Graph Company of Columbus, Ohio, whereby that company agreed to sell, and did sell, according to the terms of the agreement, to the college, one No. B. Grid-Graph score-board (for football only with advertising board), the price of which was $1,350, payable as follows: $300 December 1, 1924, $500 December 1, 1925, and $550 December 1, 1926. To represent these payments, notes were executed to the seller and delivered, signed as follows: "Centenary College by I. M. Clark, Bursar." Contemporaneous with the signing of said agreement and the notes mentioned, a supplemental agreement was signed by the seller and by Clark as bursar, providing that the college, at the end of the year 1924, had the right to return the purchased property to the seller, forwarding charges prepaid, and in the event this was done the $300 due December 1st would be forfeited to the vendor, but otherwise the contract would be terminated and the two notes not matured would be surrendered back to the college.

The score-board was shipped to and received at the college in due time and during the football season of 1924 was used twice. The note of $300 was paid at or about maturity, and thereafter Mr. Clark, bursar, advised The Grid Graph Company that the college would avail itself of the option in its favor providing for the return of the board at the end of the year and requested return of the unpaid notes. The right of the bursar to return the score-board was not questioned by the company, for on January 19, 1925, it wired Clark not to return it and to await letter being mailed. The letter requested that the matter be held in abeyance pending the arrival of the company's representative; that to return the board would be an added expense and some arrangement would be made whereby it could be used. The matter remained in this status until November 30, following, when Mr. Clark, as bursar, wrote the company, quoting former correspondence between them on the subject, and closed by asking why the two notes had not been returned pursuant to agreement. In this letter mention is made of the fact that the note maturing December 1st, prior, had been placed in a bank for collection. On December 3d the Grid Graph Company, by J. A. Howenstein, wrote Mr. Clark acknowledging receipt of his letter of November 30th, advising that the company had gone through receivership proceedings and its assets had been purchased by the writer of the letter. In this letter it is stated that all the negotiable paper the company could secure had been pledged to several banking houses in the East, and, so far as could be ascertained, the notes inquired about (those sued on) had been sold to the Mutual Finance Company of Baltimore, Md. On January 9th this finance company wrote to Mr. Clark about the note then past due, informing him of its intention to enforce payment of the note by suit if not prompt-

ly paid. On April 30, following, the Federal Credit Bureau, Inc., of New York City, wrote defendant that its client, plaintiff in this suit, had turned over to it for immediate action both of the notes in controversy. The college declined to pay the note then due and after the second note matured on December 1, 1926, this suit was filed by the Credit Alliance Corporation to enforce payment of both notes.

Plaintiff alleges itself to be the holder and owner of said notes for valuable consideration, before maturity, and without notice of any defect therein or defense thereto.

Defendant admits that plaintiff is the holder of the two notes sued on, but denies that the notes were acquired before maturity for value and without notice of defects; also admits the signature on the notes to be genuine as written, but denies that they are its notes. It is admitted that I. M. Clark signed the notes as bursar, but it is averred that he is not an officer or director of defendant college, and was not authorized to execute said notes or bind defendant thereon.

Defendant avers that "it is an eleemosynary institution organized for the purpose of educating the youth of the country; that it is not a business corporation, has never been engaged in business and that no one is authorized to bind the corporation as is alleged in this case."

The answer contains other matters of defense to plaintiff's suit, but, in view of the conclusions arrived at by us, no useful purpose will be served by making mention of them.

The lower court rejected plaintiff's demands and dismissed its suit. Appeal is prosecuted from this decree.

Plaintiff does not seriously contend that the bursar of Centenary College is vested with authority to bind that institution for the payment of notes he might execute and issue in its name, but strenuously asserts and earnestly argues that inasmuch as the score-board was received by or at the college, used by it, and the note of $300 due December 1, 1924, paid, all to the knowledge of its president, Dr. Sexton, the lack of authority of the bursar has been cured by ratification, impliedly at least, thus making the notes the binding obligations of the college.

Defendant's answer to this argument is that there has been no ratification by it; that even though its president had the knowledge of the facts imputed to him by plaintiff, yet this would not render the unauthorized notes valid and binding obligations of the college; that only its board of trustees could bind it in such matters.

We concur in this position of defendant and are quite certain the law sustains it.

Mr. Clark's position with defendant is that of head bookkeeper, but was referred to and called its bursar. He had no authority to make purchases for the college, except for books included in its annual budget.

Executing and issuing negotiable instruments for a corporation, such as defendant is, is more than an administrative function. Such is not an inherent power of any corporate officer and may only be vested by corporate action either expressed in its charter or by its board of directors in regular proceedings. If this were not true, it is obvious a corporation would be at the mercy of its officers and agents and exposed to financial ruin at all times as a result of their bad judgment, dishonesty, or fraud.

Article 438 of the Civil Code states that as a corporation is an intellectual being it is necessary that it appoint some of its members to whom the direction and care of its affairs may be entrusted, under the name of mayor, president, etc., according to the statutes and qualities of such corporation, and article 439 reads:

"The attorneys in fact or officers thus appointed by corporations for the direction and care of their affairs, have their respective duties pointed out by their nomination, and exercise them according to the general regulations and particular statutes of the corporation of which they are the heads.

"These attorneys or officers, by contracting, bind the corporations to which they belong in such things as do not exceed the limits of the administration which is intrusted to them; their act is supposed to be the act of the corporation.

"If the powers of such attorneys or officers have not been expressly determined, they are regulated in the same manner as those of other agents."

Defendant is an eleemosynary institution, governed by a board of trustees. Act No. 63 of 1871.

The nature and extent of the authority of the officers of a corporation, after once being defined by corporate action, involves, and in general is controlled by, the law of mandate, or agency. Though the chief executive officer of a corporation may be designated president, chairman, etc., yet, in reality, when acting for the corporation his capacity for all legal intents and purposes is that of agent.

"The attorney can not go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, unless ratified by the latter." Civ. Code, art. 3010.

The power of an agent to buy and sell, and to execute notes on behalf of his principal, must be special and express. Civ. Code, art. 2997; Folger & Co. v. Peterkin, 39 La. Ann. 815, 2 So. 579.

Agency, 2 C. J. 636:

Par. 280: "Commercial paper, such as bills, notes and checks, passes current to a limited extent like money, and accordingly power to an agent to execute and endorse it is to be strictly limited, and will never be lightly inferred, but ordinarily must be conferred expressly." Citing Hills v. Upton, 24 La. Ann. 427; Nugent v. Hickey, 2 La. Ann. 358; Avery v. Lauve, 1 La. Ann. 457; Lafourche Transp. Co. v. Pugh, 52 La. Ann. 1517, 27 So. 958.

"A signature by 'procuration' operates as notice that the agent has but a limited authority to sign, and the principal is bound only in case the agent in so signing acted within the actual limits of his authority." Section 21, Act No. 64 of 1904, Uniform Negotiable Instrument Act.

One dealing with an agent, or other person in a representative capacity, is bound to look to the extent of his powers. He is required to do this for his own protection, and if he neglects to use due precaution in this respect he acts at his own risk and peril. The very fact that one signs an instrument as agent or president, or employs other descriptive designation, is notice that such person is vested with limited power beyond which he cannot bind his principal.

"The principal is bound to execute the engagements contracted by the attorney, conformably to the power confided to him.

"For anything further he is not bound, except in so far as he has expressly ratified it." Civ. Code, art. 3021.

So, therefore, when the Grid Graph Company dealt with the bursar of Centenary College and accepted the notes signed by him for it without using ordinary prudence to ascertain the extent of his powers, it

did so at its own risk, for most assuredly it had impressive knowledge that it was dealing with one ordinarily without power to sign notes for his principal. When plaintiff examined these notes and observed that they were signed by the bursar for the college, whose duties, it is well and generally known, are not executive, but clerical, they were put on guard with respect to the extent of the powers of the bursar and were required to investigate such powers to the end that they might not acquire commercial paper, issued without due authority. Courts are insistent that one dealing with an agent shall inquire whether he has sufficient authority, when such agent assumes to make or endorse negotiable paper.

Dr. Sexton, president of defendant college, as a witness, stated that the first time he saw the notes sued on was when presented to him while testifying; that he only knew the notes had been issued when the bank in January, 1926, notified him that it held the note of $500 for collection; that the score-board was not used by the college but by the students and other people interested; that he made no objection to its use and "knew the general conditions under which it was gotten, nothing to object to, knew that no obligation rested on the college, knew the arrangement by which it was gotten."

Even should it be conceded that Dr. Sexton, as president, had the authority to ratify the unauthorized acts of the bursar and thereby commit the college to the discharge of these notes, and that his actions and conduct with regard to the whole affair amounted to such ratification, still we do not think the ratification accomplished the effect contended for by plaintiff, for such was done without full knowledge of all the material facts involved in the original transaction between the bursar and the selling company. We think this would be true even had the board of trustees ratified the agreement without knowledge that the notes were issued and outstanding.

We quote the following excerpt from Owings v. Hull, 9 Pet. page 629, 9 L. Ed. 246:

"No doctrine is better settled, both upon principle and authority, than this—that the ratification of an act of an agent previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts. If the material facts be either suppressed or unknown, the ratification is treated as invalid, because founded in mistake or fraud."

"The voluntary execution of a contract, *with the full knowledge of the grounds upon which it might be rescinded*, amounts to a ratification of it, and involves a renunciation of the means and exceptions that might have been opposed to it." Syllabus in Marigny v. Bank 5 Rob. 354.

The converse of the proposition is equally true. If one acts without full knowledge of the material facts, the ratification is not binding.

It is not shown that Dr. Sexton, in his capacity as president, had authority to issue binding notes in the name of the college, and in the absence of proof to that effect it cannot be assumed that such authority was reposed in him. If he was not vested with such power by the trustees, then it follows as a consequence that he could not ratify the unauthorized acts of the bursar and thereby obligate the college for any amount.

The record does not disclose who paid the $300 on the score-board, nor how it was paid. Dr. Sexton states that the board was used by the students and others inter-

ested in it. This board was purchased at a time when football spirit and enthusiasm at Centenary College ran high. It is probable the move to purchase the board originated with the student body and the athletic directors, but the evidence does not affirmatively disclose such to be true.

Counsel for plaintiff cite many cases where the principal was held to have ratified the unauthorized acts of his agent, but in practically all of these cases the principal was an individual, not a corporation, which only acts by and through its managing directors or trustees.

It is also urged upon our attention that the college failed to repudiate the unauthorized act of its bursar, after learning of same, as it was required to do under the law, and therefore must be held to have approved such acts. An officer of plaintiff testified that his company acquired these two notes on a date long prior to that on which Dr. Sexton knew they were in existence. Any formal step repudiating the bursar's actions would have been an idle gesture. The status of things had been fixed. However, refusing to pay the notes on demand because of their unlawful issuance seems to us a most definite repudiation of the bursar's unauthorized issuance of the notes in the name of the college.

Having reached the opinion that the notes sued on are not the obligations of defendant, and that the issuance of same has not been ratified and approved by the board of trustees of Centenary College, it becomes unnecessary to pass upon other defenses raised by the pleadings and argued in briefs.

For the reasons herein assigned, the judgment appealed from is hereby affirmed.