465 So.2d 929 (1985)
The NATIONAL BANK OF BOSSIER CITY, Plaintiff-Appellee,
v.
Reed NATIONS, et al, Defendants-Appellants.
No. 16826-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1985.
*930 Weems, Abney, Wright, Adams & Medlin by Lee D. Cole & Larry Feldman, Jr., Shreveport, for plaintiff-appellee, The National Bank of Bossier City.
Fish, Montgomery & Robinson by Roy M. Fish, Springhill, for defendant-appellant, Reed Nations.
Schober & Brabham by Charles J. Neupert, Jr., John L. Schober, Jr., Shreveport, for defendant-appellant, Columbia Pulp Co., Inc.
*931 Before MARVIN, JASPER E. JONES and NORRIS, JJ.
NORRIS, Judge.
This suit began as an action on a note and to recognize a mortgage. The obligor of the note was Reed Nations ("Reed"); the mortgagor was Columbia Pulp Co. Inc. ("Columbia"), an Arkansas corporation of which Reed was president and majority stockholder. The other stockholders were Reed's younger sisters; Reed's widowed mother may have also had an interest. Columbia's single asset, a large tract of land, had been allegedly mortgaged to the plaintiff, National Bank of Bossier City ("NBBC") as security for Reed's personal debt; NBBC took the mortgage on the strength of Reed's representations, Reed's signature, and the forged signature of Columbia's secretary, Reed's widowed mother. NBBC sued Reed on the note only, even though he had signed the note individually and as president of Columbia. The trial court rendered judgment against Reed on the note; this portion of the judgment is not appealed. The trial court further found that Columbia had lost its corporate existence because of years of failure to follow corporate formalities, that Reed nevertheless had apparent authority to bind the noncorporate entity Columbia, that due to a lack of actual authority Reed could bind only his proportionate undivided interest in the tract, and that the mortgage should consequently be recognized to the extent of Reed's sixty percent interest. For the reasons expressed, we reverse the trial court's judgment and order additional relief.
The facts are fairly simple as they pertain to the mortgage that generated this litigation. Reed was involved in the cattle trade in 1980. Although he was president of Columbia, he had never conducted cattle business through Columbia or on its behalf. In November 1980 he took out four loans with NBBC for a total of $300,000, secured only by chattel mortgages on the livestock he purchased. By early 1981, however, NBBC feared this security was inadequate. NBBC's agri-loan agent, who was servicing Reed's account on an interim basis, informed Reed that NBBC would need more collateral.[1] Reed replied that he was president of Columbia, which owned a large tract of land in Columbia County, Arkansas. He said that since he was president, he could get the corporation to pledge the land for his debt. NBBC's attorneys prepared the appropriate documents, including a form of corporate resolution authorizing the mortgage. On February 25, 1981, Reed signed a new, consolidation note for $300,000. On March 30, Reed presented to NBBC's attorneys the corporate resolution, purporting to bear the signature of Columbia's secretary, Sybil Nations. On the same day, Reed signed the deed of trust or common-law mortgage on behalf of the corporation. On February 3, 1983, Reed, again acting in his dual capacity as an individual and on behalf of Columbia, renewed the note and signed a "Second Extension of Real Estate Note and Lien" on Columbia's behalf. The latter note is the subject of this lawsuit.
Reed never made any payments on the note. This prompted the instant suit, filed on June 28, 1982. Columbia answered, contending that Reed's encumbrance of corporate property was an unauthorized act since there was no meeting or resolution to authorize the act and since the proffered resolution was a forgery. Columbia also reconvened, demanding cancellation and erasure of the mortgage. There was a bench trial, after which the trial court made the following findings and conclusions:
(1) Because of Reed's uncontested personal control of Columbia, and because of Columbia's inertness over the years, Columbia was no longer a viable corporation.

*932 (2) Reed's personal control over Columbia also justified NBBC in relying on his apparent authority to bind the corporation with the mortgage.
(3) Given Columbia's noncorporateness and Reed's apparent authority, Reed was entitled to encumber only his undivided interest in the corporate asset.
(4) Reed owned sixty percent of the property.
(5) NBBC's security interest is recognized with respect to Reed's sixty percent of the "corporate" property.
(6) There is money judgment against Reed personally, for $300,000.
(7) The trial court makes no mention of attorney fees.
The trial court rendered judgment in accordance with these findings on August 7, 1984. Columbia has appealed suspensively, bringing nine specifications of error. NBBC and Reed both answered, demanding a complete recognition of the alleged security interest. NBBC also appealed devolutively, seeking its attorney fees under the note. For the sake of convenience, we will address the specifications according to the issues they raise rather than serially.

ISSUE NO. 1: Admissibility of certain evidence. (Columbia Specs. 1 & 3)
As a preliminary matter, Columbia contends the trial court improperly admitted certain evidence, over objection, that exceeded the scope of the pleadings. LSA-C. C.P. art. 1154. First, there was no allegation in the pleadings that Columbia had lost its corporate existence, although a considerable amount of the admitted testimony covered the history and actions of Columbia from its inception in 1967 up to the present. Second, plaintiff's petition makes no mention of any reliance on apparent authority, although a large amount of testimony described Reed's dealings with NBBC and, arguably, NBBC's reliance on his representations of authority.
We find, however, that NBBC's petition specifically alleges actual authority in Reed, expressed in the corporate resolution, and that Columbia's answer specifically denies Reed's actual authority. With the issue thus joined, we think it was proper for NBBC to introduce any evidence available to prove the authority on which it based its claim. Our review of the pleadings convinces us that all parties were on notice that Reed's authority, actual, apparent or implied, would be crucial to establishing the validity of Columbia's mortgage or deed of trust. It goes almost without saying that article 1154 rejects "theory of the case" pleading in favor of fact pleading. See LSA-C.C.P. art. 1154, Official Revision Comment (c). As we stated in Townsend v. Cleve Heyl Chevrolet-Buick, Inc., 318 So.2d 618 (La.App. 2d Cir.1975):
When the pleading in question is construed in its entirety and with all other matters occurring during trial which relate to the pleading, and it is more reasonable than not to conclude that the adverse party was given fair notice and was fairly informed of the pleading's intended substantive result and procedure by which this result was intended to be accomplished, the pleading will be held to be legally effective and to satisfy the requirements of the Code of Civil Procedure which are raised in objection to the pleading. 318 So.2d at 623.
See also Cox v. W.M. Heroman & Co., 298 So.2d 848 (La.1974).
As for the objection about noncorporateness, we find that the evidence tending to support this claim was essentially the same as that used to assert Reed's authority. This is necessarily so when Reed's managerial acts, supportive of apparent authority, could amount to gross mismanagement, supportive of piercing the corporate veil. Once the evidence was properly admitted for one purpose, it could not be excluded as expanding the pleadings under another theory. See Mouledous v. Poirier, 221 So.2d 291 (La.App. 4th Cir.1969).

ISSUE NO. 2: Corporate existence. (Columbia Spec. 2; NBBC Spec. 1)
For different reasons entirely, all parties contend that the trial court erred in finding Columbia to be a corporation in *933 name only. By stipulation, Arkansas law is to govern the question of corporate existence; this makes it difficult, but the parties elected Arkansas law in the contract, and Columbia is an Arkansas corporation with real property in Arkansas, bound under an Arkansas security device. We are reluctant to make pronouncements under the law of another state, especially when that law mandates a reversal, but we find Arkansas law clearly requires a holding in favor of Columbia's corporate integrity.
In the first place, Columbia has fully complied with its statutory duties. According to the testimony and contrary to the trial court's findings, it has filed its annual franchise tax returns and there have been no proceedings for forfeiture of its charter by the secretary of state. Ark.Rev.Stat. §§ 84-1835, 1842. Columbia also appears to have complied with its duty to maintain books and records, even if its meetings have been sporadic and infrequent. Ark. Rev.Stat. § 64-312. Furthermore, we are unable to discern any corporate conduct that would entitle anyone to compel involuntary dissolution or liquidation of Columbia. Ark.Rev.Stat. §§ 64-907, 908.
The jurisprudence also strongly favors upholding corporate integrity. In the seminal case of Rounds & Porter Lumber Co. v. Burns, 216 Ark. 288, 225 S.W.2d 1 (1949), the Arkansas court held that it was "only when the privilege of transacting business in corporate form has been illegally abused to the injury of a third person that corporate entities should be disregarded." We do not think the single unauthorized act by Reed begins to approach the illegal abuse contemplated by the Arkansas court in this opinion. The Arkansas court has also held that failure to hold annual meetings is not fatal to corporateness. Don G. Parker, Inc. v. Point Ferry, Inc., 249 Ark. 764, 461 S.W.2d 587 (1971). Although Columbia's situation is distinguishable from Point Ferry's and, arguably, less favorable, we think Columbia's infrequent meetings were consistent with its business purposes, which were temporarily reduced to holding title to real property for the time being. The Arkansas court summarized its position:
We have carefully considered citations by appellant of respected text authorities who sanction a much broader base for disregarding corporate entities, but we decline to deviate from our own rule which is well established. 461 S.W.2d at 590.
Viewed from this perspective, the fact of corporate inactivity does not support a disregard of the corporate entity. In questions of law, we are not bound by the rule of "much discretion." LSA-Const. art. 5, § 10(B). Accordingly, we reverse the trial court's conclusion that Columbia was a corporation in name only.[2]

ISSUE NO. 3: Apparent Authority. (Columbia Specs. 4, 5 & 7)
The trial court concluded that Reed possessed apparent authority to encumber Columbia's real estate. Columbia advances three arguments attacking various aspects of this finding. For the reasons expressed, we hold the trial court's conclusion legally erroneous and reverse it.
Apparent authority is a principle of estoppel, which operates in favor of third persons seeking to bind a principal to an unauthorized act of an agent. In this context, it is both fair and equitable to govern mutual rights and liabilities by the apparent scope of an agent's authority, because third persons, who are not privy to the actual terms of the agency agreement, must rely entirely upon the indicia of authority with which the agent is vested. Broadway v. All-Star Ins. Corp., 285 So.2d 536, 538 (La.1973).
In our opinion, the concept of apparent authority does not apply to this case. *934 The record is completely devoid of evidence to suggest that NBBC relied on any of Reed's indicia of authority. In fact, the evidence that NBBC sought actual authority through a corporate resolution is not just clear, but blinding. R.p. 56. Where, as here, the third person demands actual authority, and refuses to execute the instruments of indebtedness and security until he receives such authority, it strains the credibility to argue reliance on apparent authority.
Even assuming, however, that apparent authority is an element of this case, and embarking on the discussion only because the litigants were so compelled by the trial court's strained reasoning, we do not think NBBC has made a case for apparent authority. A finding of apparent authority requires a dual showing of manifestation by the principal and reasonable reliance by the third party. See Lilliedahl & Mitchel, Inc. v. Avoyelles Trust & Sav., 352 So.2d 781 (La.App. 3d Cir.1977). In the first place, NBBC did not rely on any corporate representations by Columbia. It relied only on Reed's assertions that he was president of a corporation which owned immovable property and that he could secure the corporate resolution necessary to enable him to encumber the property as security for his personal debt. Further, we do not consider NBBC's actions reasonable. As we stated in the case of Roney v. Peyton, 159 So. 469 (La.App. 2d Cir.1935),
[I]t is a rule too well established to require citation, that a person who accepts the property or money or assets of a corporation, in payment of the personal obligations of its officers, does so at his peril and is put upon inquiry. In such a case he is not protected by the mere assertion of the officer interested. 159 So. at 474.
What NBBC did was to provide Reed with a standard form of corporate resolution and accept it some months later without question. It did not take the usual precautions of requiring an affidavit to be executed before its own notary or demanding a shareholder list.[3] See Pargas, Inc. v. Est. of Taylor, 416 So.2d 1358 (La.App. 3d Cir.1982); Byles Welding & Tractor, Inc. v. McDaniel, 441 So.2d 48 (La.App. 3d Cir. 1983). Under the circumstances, NBBC's conduct was rather careless and certainly not reasonable.
The other requirement in Lilliedahl is a manifestation by the principal. In favor of a finding of manifestation, NBBC cites the lead case of Analab v. Bank of the South, 271 So.2d 73 (La.App. 4th Cir. 1972). In that case, the defendant bank was held liable for a private contract entered into by its president. The president's acts, however, were completely unauthorized, so any liability in the bank would have to be based on apparent authority. The court found that the bank had allowed its president to conduct personal business from his bank office, to use bank stationery and to identify himself as a bank official in his private dealings. The court held that the bank's inactivity or sufferance of its president's private acts amounted to a manifestation of authority. The analogy, however, between Analab and the instant case is too tenuous to justify a similar result here. Columbia cloaked Reed with no indicia of authority. There was no office, no phone and no secretary. In fact, NBBC knew precious little about Columbia when it accepted Reed's assertion of authority to bind Columbia's property. The representations of the officer involved do not, under these circumstances, amount to manifestations by the principal. Roney v. Peyton, supra. Furthermore, a single act of management is not enough to establish apparent authority. Beneficial Loan Soc. v. Strauss, 148 So. 85 (La.App.Orl.Cir. 1933).
We can find no evidence of any act on Columbia's part sufficient to support a "manifestation" and an equitable finding of apparent authority. The trial court's ruling on this score is accordingly reversed.

*935 ISSUE NO. 4: Can a forged document serve as mandate? (Columbia Spec. 6)
In its sixth specification, Columbia contends the trial court erred in upholding a security device based on a forged document. This issue is closely related to the question of apparent authority and overlaps it because NBBC claims to have relied on the forged resolution as one aspect of its "reasonable" belief in Reed's authority. Confessing the unavoidable overlap, we will discuss this issue in terms of special code articles and then relate it to the problem of apparent authority.
Our code requires express power for the alienation or encumbrance of an immovable by mandate. LSA-C.C. art. 2996 provides:
A mandate conceived in general terms, confers only a power of administration.
If it be necessary to alienate or give a mortgage, or do any other act of ownership, the power must be express.
LSA-C.C. art. 2997 provides in part:
Thus the power must be express for the following purposes:
To sell or to buy.
To incumber or hypothecate.
* * * * * *
A plain reading of these articles places it beyond conjecture that a mortgage of real property by mandate is a nullity if the mandatory lacked appropriate authority. In the instant case, all parties admit that Columbia never extended to Reed the express mandate required by these articles. Consequently, this mortgage is a nullity.
We feel that NBBC's alleged reliance on the forged document can be of no avail in light of these code articles and the famous precept of McDuffie v. Walker, 125 La. 152, 51 So. 100, 105 (1910): "Fraud cuts down everything." There is a "radical invalidity of forged instruments affecting land" under Louisiana law. Gulf South Bank & Trust Co. v. Demarest, 354 So.2d 695 (La.App. 4th Cir.1978). See also First Nat'l Bank of Ruston v. Mercer, 448 So.2d 1369 (La.App. 2d Cir.1984).
We admit that we have been unable to find any cases from our jurisdiction that address the precise issue of a forged corporate resolution. The federal courts in this state, however, have faced the issue twice and resolved it against the validity of the forged resolution. In the early case of Ansley Land Co. v. H. Weston Lumber Co., 152 Fed. 841 (E.D.La.1907), the president of defendant corporation signed a timber deed to plaintiff; plaintiff later sought to annul the deed. The court summarized the evidence and its holding as follows:
It is conclusively shown that no meeting of the board of directors was held in November, 1903, and that no resolution such as that above copied was ever passed at any time, and that the other officers and stockholders of the company knew nothing of the proposed transaction, and the company never received any part of the price. The signature of Charles D. Smart, secretary, was forged. As soon as the officers of the company learned of the transaction, the Weston Company was notified in writing that the sale had not been authorized, and they were warned not to cut any timber. The sale executed by M.E. Ansley, under the above circumstances, was null. 152 Fed. at 843.
A similar situation was presented in Marsh Inv. Corp. v. Langford, 490 F.Supp. 1320 (E.D.La.1980), aff'd, 652 F.2d 583 (5th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982). The facts in this fascinating case included a non-existent directors meeting, an imaginary corporate secretary, a resolution and assorted affidavits that were forged, and a corporation controlled by Carlos Marcello. After noting that the evidence did not support a finding of apparent authority, the court explained further:
Even more, it is not even clear that the doctrine of apparent or inherent authority can apply in this case. The Louisiana civil code provides that the power must be express and special for an agent "[t]o incumber or hypothecate." [LSA-C.C. art. 2997.] So it seems that not even Carlos Marcello himself, or any officer of *936 Marsh for that matter, could have validly executed these mortgages, because even though the corporation usually followed Marcello's recommendations, he was not expressly authorized by resolution to take such action in the name of the corporation. 490 F.Supp. at 1327.
The court proceeded to say that mortgaging the property of a corporation is more than an administrative function, quoting from our opinion in Credit Alliance v. Centenary College, 17 La.App. 368, 136 So. 130 (1931):
Executing and issuing negotiable instruments for a corporation, such as defendant is, is more than an administrative function. Such is not an inherent power of any corporate officer and may only be vested by corporate action either expressed in its charter or by its board of directors in regular proceedings. If this were not true, it is obvious a corporation would be at the mercy of its officers and agents and exposed to financial ruin at all times as a result of their bad judgment, dishonesty, or fraud. 136 So. at 131.
Although the issue in Credit Alliance was not precisely the same as in the instant case, we think the rationale of guarding against fraud applies equally and indeed underscores the function of code articles 2996 and 2997.
We are not unmindful of the numerous cases that find apparent authority, starting with Case v. Citizens Bank of La., 10 Otto 446, 100 U.S. 446, 25 L.Ed. 695 (1880), and creating an imposing line of jurisprudence. The vast majority of those cases, however, involve contracts for personal services and for movable goods and are therefore exempt from the restrictions of the code articles cited above. Two cases are worthy of special note, however, because they appear to extend the notion of apparent authority to real estate transactions.
In Ideal Sav. & Homestead Ass'n v. Kerner, 208 La. 513, 23 So.2d 200 (1945), the plaintiff homestead had been attempting for some time to sell off a piece of property. Its real estate agent finally found a purchaser, the defendant, who executed an act of sale at the homestead's office on the strength of a notarized resolution and the signatures of the homestead's president and real estate agent. The sale was witnessed by other homestead personnel. The problem arose when the president failed to turn over the sale proceeds to the homestead; he arranged a scheme whereby he continued to pay monthly rent on the house, as if it had never been sold. Some time later, the homestead sought to annul the sale; the trial court complied but the supreme court reversed. Its opinion is a lavish exposition of apparent authority doctrine and jurisprudence, omitting any mention of articles 2996 and 2997. On closer examination, however, certain undeveloped facts support the result, if not the stated rationale, in Kerner. The homestead's directors had hired the real estate agent and apparently followed his progress for over a year. Furthermore, the court said, "The plaintiff's own evidence makes it doubtful whether the Board of Directors did not pass a resolution authorizing the president to sign ..." 23 So.2d at 201. These remarks suggest that there really was full consent and a written mandate. There was full knowledge in that the homestead attorney who examined the title and prepared the sales documents was a member of the board of directors. The court also mentioned that the homestead failed to attack the fraudulent sale for over a year, in spite of regular internal and State audits which should have revealed the scheme, thus indicating a sort of ratification. Finally, there was an otherwise very strong case of apparent authority.
In Spiers v. Seal, 426 So.2d 631 (La.App. 1st Cir.1983), writ denied 433 So.2d 150 (La.1983), the defendants were Clyde and Edward Seal, sole shareholders, directors and officers of Seal Lumber Co. Inc. Working through a real estate agent, they allegedly entered an agreement to sell twenty-six acres of land near Bogalusa. They failed to show up at the closing because they "just decided it was kind of a bad deal." 426 So.2d at 633. In a suit for *937 specific performance, they contended their offer was not supported by any resolution of the Board of Directors, written or verbal. The court enforced the contract on a theory of apparent authority. We think this result was fair because neither Clyde nor Edward denied their corporate intent to sell. Intent was expressed by a listing agreement, signed by Clyde, and a sales offer, signed by Edward as president; thus there was written consent from all shareholders, directors and officers, in compliance with article 2997. Furthermore, there was a subsequent "Agreement to Purchase" signed by both Clyde and Edward. This operates as a ratification. Finally, there was the guileless attempt to recede, which was patently arbitrary. Under these circumstances, we think the result was correct. We cannot subscribe, however, to our brethren's broad language under headnotes 5 and 6, to the effect that apparent authority is an "obvious" exception to article 2997. Such a reading would emasculate that article.
In conclusion, we hold that the forged resolution was entirely without effect as express authority and could not provide a basis for apparent authority. We also conclude that Columbia is entitled to the cancellation and erasure of the mortgage, or "Second Deed of Trust," as prayed for in its reconventional demand.
Because of this conclusion, it is unnecessary to consider Columbia's Specification No. 9, claiming it was error to recognize NBBC's security interest in Reed's share of the corporate property.[4]

ISSUE NO. 5: Attorney fees. (NBBC Spec. 2)
NBBC has appealed the trial court's failure to award attorney fees against Reed. Although the trial court is in the best position to set attorney fees, an appellate court may do so when the record provides an adequate basis for setting them. McCarthy v. Louisiana Timeshare Venture, 426 So.2d 1342 (La.App. 4th Cir. 1982), writ denied 433 So.2d 163 (La.1983); City Bank & Trust Co. v. Hardage Corp., 449 So.2d 1181 (La.App. 2d Cir.1984). The criteria for setting a reasonable fee are listed in Code Prof.Resp., DR 2-106, LSA-R.S. 37:219 et seq. We think the trial court's omission of attorney fees was an oversight and we will amend the judgment accordingly.
The promissory note contains the standard contractual language setting attorney fees at twenty-five percent of the amount then due and payable. Cognizant of the principles of Leenerts Farms, Inc. v. Rogers, 421 So.2d 216 (La.1982), under which a fee of twenty-five percent of a $300,000 award would be clearly excessive, NBBC suggests a fee of $10,000 for its collection services. NBBC's work in the instant case has been fairly extensive. It includes collecting the documentary proof of the debt, preparing the affidavit of correctness, drafting the petition, answering Columbia's reconventional demand, preparing for a deposition (it is not clear whether the deposition was ever held), making a third-party demand against Mr. Barnette, participating as plaintiff in a one-day trial, taking the instant appeal and writing the trial and appellate memoranda.
We note, however, that a major portion of this effort was exerted in the futile attempt to hold Columbia to the invalid mortgage. Reed himself was essentially defenseless and taking a judgment against him alone would have been rather routine, but for Columbia's involvement. We also recognize that Reed's fraud drew Columbia into the litigation in the first place. Balancing these factors, we will set the attorney fees at $5,000 against Reed personally.

DECREE
For the reasons expressed, the judgment of the lower court is reversed, amended in part and rendered as follows:
*938 Judgment in favor of NBBC and against Reed Nations individually is increased by $5,000.
Judgment declaring Columbia Pulp Co. Inc. to be a noncorporate entity is vacated. The judgment recognizing NBBC's lien on the tract of land described therein is also reversed.
Judgment dismissing Columbia Pulp Co. Inc.'s reconventional demand is also reversed and vacated; the relief demanded is hereby granted, ordering cancellation of the mortgage and erasure of its inscription from the public records.
AMENDED IN PART; REVERSED AND RENDERED.
NOTES
[1] Reed's account was originally serviced by Herb Adams, NBBC's president. Mr. Adams did not testify at trial. The interim agri-loan agent was Jimmie Barnette, who testified at trial. NBBC filed a third-party demand against Mr. Barnette in Columbia's reconventional demand. NBBC has not appealed the trial court's dismissal of this claim so it is not before us.
[2] We are frankly perplexed by the trial court's determination to pierce the corporate veil. The usual function of such a procedure is to enable a creditor to penetrate the corporate shell and reach the personal assets of the president, corporate officer or shareholder. Here, the intended effect is exactly the opposite: the creditor already has the personal liability of Reed on his note and is attempting to reach the corporate assets.
[3] NBBC admitted never having inquired who the other shareholders of Columbia were. R.p. 63. This fortifies our conclusion that NBBC really operated on a basis of express authority.
[4] We pretermit discussion of the remaining assignment of error, contesting the trial court's determination of Reed's interest in Columbia's property. Given the correct disposition of this case, that issue was not properly before the court. Besides, the evidence is so confusing that we are at pains to say the trial court was not manifestly erroneous. Reed's interest can be decided in subsequent enforcement proceedings in which the parties, alerted to the issue, can present more conclusive evidence.