In re MANVILLE FOREST PRODUCTS CORPORATION, Debtor.

GULF STATES EXPLORATION CO., Plaintiff,

v.

MANVILLE FOREST PRODUCTS CORPORATION, Defendant.

Bankruptcy No. 82 B 11659.
Adv. No. 85–5911A.

United States Bankruptcy Court,
S.D. New York.

Aug. 5, 1988.

motion in tandem with the 90 day extension of the time to assume or reject the lease.

Shotwell, Brown & Sperry, Monroe, La. (C.A. Martin, III, and George Wear, Jr., of counsel), Levin & Weintraub & Crames, New York City by Edmund M. Emrich, for debtor.

Liskow & Lewis, New Orleans, La. (Frederick W. Bradley, of counsel), John T. McMahon, Houston, Tex., Lansing R. Palmer, New York City, for Gulf States Exploration Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON OBJECTION TO CLAIM

BURTON R. LIFLAND, Chief Judge.

### I. Introduction

On August 26, 1982, Manville Forest Products Corporation ("M.F.P." or "Debtor") filed a voluntary petition for reorganization under Chapter 11, section 301 of the Bankruptcy Code (the "Code"). M.F.P. continued in the management and possession of its business and properties pursuant to sections 1107 and 1108 of the Code.

Prior to the Chapter 11 filing, M.F.P. and Gulf States Exploration Company ("G.S.") entered into a hydrocarbon exploration agreement. Pursuant to that agreement G.S. drilled four wells on M.F.P.'s property. G.S. then sought to have M.F.P. grant it drilling rights on specified acreage, down to a particular geological formation on M.F.P.'s property named the Wilcox Formation ("Wilcox"), which G.S. coveted and alleged was included in the exploration agreement. M.F.P. refused to grant the request, asserting that although the explo-

ration agreement embraced other formations, it excluded the Wilcox. As a result of M.F.P. subsequently filing its chapter 11 petition, G.S. timely filed a proof of claim for $16,035,000 against M.F.P.'s estate, alleging that M.F.P.'s refusal to grant the Wilcox rights amounted to a breach of the exploration agreement. M.F.P. objected to this claim.

At the request of the Court, pursuant to Fed.R.Bankr.P. 9014, the parties exchanged further documents in the form of pleadings in accordance with Part 7 of the Bankruptcy Rules. This was solely for the purpose of aiding the Court and the parties in clarifying and refining the issues surrounding this claim objection proceeding. Although the claims objection process was strictly pursuant to 11 U.S.C. § 502, the complaint filed by G.S. alleged $31,009,837 in damages in an *ad damnum* clause. No amended claim was ever filed, nor was there ever any authorization to broaden the scope of this claim objection motion which is a contested matter. *See* Fed.R.Bankr.P. 9014. The restructuring of the contested matter papers into formal pleadings so as to focus the issues, does not in any way alter the fundamental claims dispute nature of this matter which is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B). *See* Pretrial Order.

*II. Findings of facts*

G.S.'s filing of its proof of claim is best characterized as an attempt by G.S. to prospect for a recovery in this Chapter 11 case after being unsuccessful in its oil field prospecting.

An extensive trial, yielding over 1,400 pages of trial transcript, revealed the following which constitute this Court's findings and conclusions pursuant to Fed.R. Civ.P. 52 as incorporated by Fed.R. Bankr.P. 7052.

M.F.P. is a subsidiary of Manville Corporation and is the owner of land and mineral rights in the State of Louisiana. At all times relevant to the instant decision the mineral rights underlying the area in question were owned proportionately by: M.F. P. (57.3507%), Donner Properties (41.4752%) and Whitney National Bank (1.1741%). (Pretrial Order at 2 para. 5).

John D. Mullens ("Mullens") was president of M.F.P. from 1977 through February 1981. M.F.P.'s Board of Directors granted him specific authority to make contracts and deeds conveying, *inter alia* real property, rights, or mineral leases on behalf of the corporation. (Exhibit ("Ex.") 1). This included the right to delegate his grant of authority. (*Id.*)

Donald R. Worden ("Worden") was an employee of M.F.P. whose job title was first, Exploration and Mineral Manager and then, as of May 1982, Director of Energy Resources. (Pre-trial Order at 2, para. 3). He was not an officer of MFP. (*Id.*). From January 1, 1980 until November 3, 1983, Worden reported directly to M.F.P.'s president. (*Id.*). After November 3, 1983 he reported to Roger Krapfl, at that time an officer of M.F.P., who in turn reported to M.F.P.'s president. (*Id.*).

Mullens delegated to Worden the authority to enter into agreements which affect up to 1000 acres of M.F.P.'s land. (Ex. 2). This limited grant of authority was on file in the public records of Grant Parish, Louisiana.

G.S., a wholly owned subsidiary of Gulf States Oil and Refining Company, is based in Houston, Texas. G.S. was formed to explore for oil and gas in Texas and Louisiana. (Transcript ("Tr.") at 19). G.S.'s management consisted principally of J.C. Ogden ("Ogden"), who was its vice-president and geologist from January 1980 to March 1983 (Pre-trial Order at 1, para. 3), and Barbara Price ("Price")—the "Landman"—the person in charge of evaluating and administering leases. (Tr. at 17, 313–14).

Ogden sought exploratory rights for G.S. in Grant Parish, Louisiana. He therefore approached and negotiated with Worden to obtain rights to explore for, and develop, oil and gas on a particular area of M.F.P.'s property known as sections 4–10, Township 8 North, Range 3 West, Grant Parish, Louisiana (the "Area of Interest"). (Pre-trial Order at 2, para. 4; Tr. at 46–48). The

Area of Interest was in excess of three times Worden's granted authority. Ogden felt that two rock formations in the Area of Interest, specifically the Mooringsport and the Wilcox formations, would produce oil.[1]

After a number of preliminary contacts from G.S., Worden had M.F.P.'s counsel draft an exploration agreement ("Exploration Agreement" or "Agreement") in October 1980, which Mullens, M.F.P.'s president, signed on behalf of M.F.P. (Pre-trial Order at 2–3, para. 8). Worden then sent the Agreement to co-owner Donner Properties who along with Whitney National Bank, owned a mineral servitude on the acreage. (*Id.;* Tr. at 50–51). Donner Properties also signed the Agreement, and then forwarded it to Gulf States in November 1980. (Pre-trial Order at 2–3, para. 8).[2] The Agreement explicitly excluded mineral rights to the Wilcox.[3] Nonetheless, under the Agreement G.S. was required to "log" the Wilcox (i.e. graph it in order to illustrate the potential production of oil and the thickness of the drilled zones; Tr. at 25) each time it drilled through that formation to deeper formations.[4]

After reviewing the Exploration Agreement as signed by Mullens for M.F.P., as well as by Donner Properties, Ogden contacted Worden and informed him that it was unacceptable. (Ex. 11). Specifically Ogden noted, *inter alia,* the following shortcomings: 1) it excluded the Wilcox from the scope of the Area of Interest; 2)

the acreage to be leased to G.S. was too limited and 3) the starting date of the exploration program was March 1, 1981 instead of June 1, 1981. (*Id.; see also* Tr. at 328–31). As a result, in December 1980 Ogden sent Worden a list of proposed amendments to remedy each of the perceived shortcomings. (Ex. 11; *see* Tr. at 60–62, 328–30).

During the course of a telephone conversation sometime between December 9, 1980 and January 2, 1981, Worden agreed to include the Wilcox in the Agreement. (Tr. at 65–66). Thereafter Barbara Price, the Landman, added as interlineations to the Agreement, the proposed changes which included the Wilcox. (Tr. at 67). Those interlineations were to be initialed by the parties. (Tr. at 66–68). The interlineations included the following underlined phrase:

"All of such lands [the Area of Interest], less and except all formations above the base of the Wilcox Formation, *to be included under separate agreement,* are hereinafter referred to as the 'Area of Interest' [emphasis added]. . . ."

(Ex. 7 at 1).

On January 2, 1981 Ogden signed the interlineated Agreement for G.S. (Tr. at 69). Subsequently, on February 11, 1981, Worden wrote and signed a letter on Manville stationary addressing G.S.'s right to the Wilcox Formation (the "Wilcox Letter") which G.S. received.[5] G.S. also received an

---

**1.** The Mooringsport is a deep formation found at 9,000 to 10,000 feet beneath the earth's surface. (Tr. at 81, 90, 97).

The Wilcox is a relatively shallow formation spanning from 1,200 feet below the earth's surface to a depth of 4,400 feet. (Tr. at 26).

**2.** G.S. subsequently obtained a lease from Whitney National Bank of New Orleans, of the Bank's interest of 1.174% in the remaining M.F.P. acreage. (Ex. 32, 33).

**3.** Relevant portions of the Agreement state:

"[area includes] [a]ll of such lands *less and except all formations above the base of the Wilcox Formation* [emphasis added]." (Ex. 7 at 1, para. 1);

"even though the Wilcox Formation is excluded from this agreement. . . ." (*Id.* at 3, para. 1.4).

**4.** The relevant portion of the Agreement states: "*Logging of Wilcox Formation:* As a part of the

consideration for which this agreement is made and even though the Wilcox Formation is excluded from this agreement, Lessee, at its sole cost and expense, shall run an Induction Electric Log through the entire Wilcox Formation; and if any suspected shows are reflected in said Induction log, Lessee shall also run a Sonic-Neutron log." (Ex. 7 at 3, para. 1.4).

**5.** The Wilcox Letter states in relevant part:

"Manville Forest Products Corporation has granted to Gulf States Exploration Company the above Exploration Agreement. This letter will set forth our agreement and understanding that although all depths and formations above the base of the Wilcox Formation are excluded from the above referenced Exploration Agreement; in the event that you drill a well or wells upon the property covered by said agreement or upon property unitized with said property and log the Wilcox Formation and conclude that you

identical letter from Donner Properties. (Ex. 21; *see* Tr. at 71–72, 1241–42). Unlike the letter from Worden which was signed only by him, the letter from Donner Properties to G.S. contained the signatures of both Nicholas J. Rappolo and Bill Oliver ("Oliver"). This was because Oliver lacked the requisite authority to sign the letter on behalf of Donner Properties. (Tr. at 1242).

In response to Worden's assurances that the Wilcox Letter was en route, Ogden sent the interlineated Exploration Agreement, which he had previously signed, to M.F.P. (Ex. 19). Upon receiving the interlineated Agreement, Worden initialed the interlineations by G.S. without first submitting them to Mullens, M.F.P.'s president, for approval. (Pre-trial Order at 3, para. 10).

Thereafter G.S. entered into letter agreements in April and May 1981, which created a working interest partnership among the following partners, each acquiring the following proportional interests in the Exploration Agreement: G.S. (39.0625%), X Oil Energy Resources, Inc. (31.25%) [6], Phibro Oil and Gas Corp. (25%), Edward L. Bowman (3.125%), T.G. Anderson (1.5625%). (Pre-trial Order at 6, para. 25).[7] In addition, G.S. entered into an agreement with Ogden wherein he personally received "a two percent of eight-eighths overriding royalty interest ... in production from the New Verda Prospect." (Pre–Trial Order at 6, para. 26). Accordingly, Ogden conceded that he has a personal stake in the outcome of this litigation. (Tr. at 88; *see* Ex. 156).

In 1981, G.S. proceeded to drill four wells in the Area of Interest. The first three wells, No. 1, A–1, B–1, were somewhat productive in the Mooringsport formation. Logs of the first two wells, No. 1 and A–1, did not reflect hydrocarbon "shows" (i.e.

indications that a potential reservoir of oil could be found) in the Wilcox formation. (Tr. at 85, 91, 137). However, there were shows indicating possible production in the Wilcox formation, on the log run of the third (B–1) well. Therefore, in early August 1982, G.S. requested a Wilcox lease from M.F.P., for the acreage located around this well. That acreage was identified as Northeast Quarter of section 7. (Tr. at 103). Worden refused this request in the course of a telephone conversation with Price. (Tr. at 100–01). On August 4, 1982 Ogden sent a formal request for the Wilcox rights to M.F.P. (Ex. 81). That request was denied pursuant to a letter from Worden to Ogden dated August 10, 1982. (Ex. 88).

On August 6, 1982, G.S. recorded the Exploration Agreement and the Wilcox letter in the public records of Grant Parish, Louisiana for the purpose of preserving any third party rights it might have against persons other than M.F.P. (Pre-trial Order at 5, para. 17; Tr. at 403).

M.F.P. refused to grant the Wilcox rights to G.S. because it had previously granted those rights to Hogan Exploration Company ("Hogan") pursuant to the following transaction. On June 16, 1982 Robert Meredith ("Meredith") acting for Hogan, solicited the desired Wilcox rights in the Area of Interest directly from M.F.P. via telephone conference and follow-up letter. (Tr. at 1274, 1344; Ex. 73). Worden responded by letter dated June 25, 1982 that the requested Wilcox rights were already committed to a third-party named Haddox. (Tr. at 1277–78; Ex. 75). Worden suggested that Meredith work something out with Haddox, and the two subse-

desire a lease upon said formation, then upon your written request and receipt of a copy of said log, we will grant to you without the payment of any consideration a separate lease upon the same form as the lease attached to the said Exploration Agreement as Attachment I providing for a primary term of six (6) months covering all our unleased and uncommitted mineral interests in the government quarter section upon which the well in question which has been drilled by you is located." (Ex. 17, 120).

**6.** Although Exhibit 29 reflects a different percentage interest controlled by X Oil Energy Resources, Inc., this Court will accept as correct the percentage interest reflected in the pre-trial order, as agreed to by the parties.

**7.** In a "working interest partnership" each partner is responsible for making capital contributions equal to his proportionate interest in the partnership. *See* Tr. at 32, 357, 596.

quently did enter into an agreement. (Tr. at 1278–79, 1282, 1285). Accordingly, a few days later Worden orally agreed to lease the Wilcox rights in the Area of Interest to Hogan and Haddox. (Tr. at 1286). Hogan subsequently received a written lease from Manville, by letter dated August 6, 1982. (Tr. at 1287; Ex. 83). On August 9, 1982 Worden on behalf of M.F.P. executed a revised Wilcox lease in favor of Hogan which corrected errors in the prior written lease, covering the requested well acreage, effective as of June 16, 1982. (Ex. 74).

After receiving G.S.'s request for the right to drill into the Wilcox, on the northeast quarter of Section 7, Worden called Meredith to determine whether Hogan would be willing to cede that area to G.S. (Tr. at 1291). Meredith agreed to make the concession in return for G.S. acknowledging Hogan's rights to the balance of the Wilcox acreage. (Tr. at 251–52, 1292; Ex. 88).[8] G.S., which had a lease on the Donner Properties and Whitney National Bank interests in the Wilcox Formation in the Area of Interest, amounting approximately to a 42% interest, refused to enter into such an agreement.

Meredith also offered to enter into a joint drilling agreement with G.S., in exchange for G.S.'s agreement to recognize Hogan's valid title to the balance of the M.F.P. Wilcox interests. (Tr. at 1297; Ex. 110). G.S. again refused. As a result, neither G.S. nor Hogan had the right to 100% of the instant Wilcox rights. (Tr. 1295).

The Wilcox lease which Hogan received from M.F.P. required that Hogan commence operations within one year after the June 16, 1982 agreement date (i.e. drilling had to commence by June 16, 1983). (Tr. at 1295). The Wilcox lease which G.S. acquired from Donner Properties required G.S. to commence operations by December 1, 1982. (Tr. at 1296). As a result, rather than drill prior to December 1, 1982 and incur an obligation to share its profits with G.S., Hogan decided to defer drilling until after that date, with the intent of securing for itself what would then be G.S.'s expired rights to Donner's interests, and in turn nearly 100% of the profits. (Tr. at 1300).[9] As Hogan anticipated, G.S. did not commence any drilling of its Wilcox interests underlying the Area of Interest by December 1, 1982 and as a result, by letters dated February 7th and 8th, 1983, Hogan acquired Donner Properties' interest in those Wilcox rights. (Tr. 1301–02; Ex. 121 & 122).

M.F.P. filed a petition for reorganization under Chapter 11 on August 26, 1982. G.S.'s timely filed proof of claim seeks $16,035,000.00 as damages for Debtor's alleged breach of contract. M.F.P. objected to the proof of claim. With leave of this Court, and solely for the purpose of aiding the Court and the parties in clarifying the issues, formal pleadings were used pursuant to Part 7 of the Bankruptcy Rules. Notwithstanding the fact that its proof of claim was in the amount of $16,035,000, G.S.'s complaint alleged $31,009,837.00 in damages. On March 26, 1984, M.F.P.'s plan was confirmed by this Court.

### III. Issues

This proceeding raises the following issues:

---

**8.** That offer appears in an August 10, 1982 letter from Worden to Ogden which reads in relevant part:

"[i]n an effort to provide you with the lease you requested, we contacted Hogan and they agreed to release any claim to the Wilcox Formation in the NE/4 of Section 7 so that we could grant you the requested lease if you released any claim to the Wilcox Formation on the balance of the area committed to Hogan."

**9.** G.S. still apparently retained the 1.174% mineral interests acquired from Whitney National Bank.

A) Whether Worden had the express or apparent authority to enter into the interlineated Exploration Agreement and execute the Wilcox letter on behalf of M.F.P.

B) Whether M.F.P. ratified the interlineated Exploration Agreement and the Wilcox letter.

C) Whether, under the interlineated Exploration Agreement and the Wilcox letter, M.F.P. remained free to grant Wilcox leases to third parties, until G.S. complied with the obligations of the Wilcox letter and requested a Wilcox lease.

D) Whether G.S. can properly assert damages in excess of its filed proof of claim?

E) Whether G.S. can successfully assert the claim of its working interest partners?

## IV. Discussion

The record is thorough and voluminous and it requires extensive review to parse the many fact driven issues raised by the parties in this matter.

A. *Under applicable law the instant facts establish that Worden did not have express or apparent authority to alter the Exploration Agreement or to execute the Wilcox letter.*

(1) Express Authority

 This Court is bound to apply Louisiana law in order to resolve the state law contract issues raised in the instant matter. *See e.g., Fejta v. GAF Companies, Inc.,* 800 F.2d 1395, 1396 (5th Cir.1986). Pursuant to Louisiana law, the authority to act on behalf of a corporation is vested in the corporation's board of directors unless the board or the by-laws provide otherwise. La.Rev.Stat.Ann. tit. 12 § 81, 82 (West

1969). In Louisiana, "mineral rights are real rights" and therefore are subject to the provisions governing immovable property. *See Id.* at tit. 31 § 16 (West 1975). A corporate employee must be granted express, written authority in order to bind the employer corporation, with respect to immovable property. *See* La.Civ.Code Ann. art. 2996, 2997 (West 1952), *see, generally, id.* at art. 3010 (West 1952);[10] *Morvant v. Arnoult,* 490 So.2d 549, 551 (La.App. 4th Cir.1986) ("if an agent executes the contract on behalf of the buyer or seller, the agent's authority must be expressed and in writing."); *Ward v. Pennington,* 434 So.2d 1131, 1137 (La.App. 1st Cir.1983). A corollary to this principal is that "an agent has no power to abrogate or modify a contract without the knowledge and consent of his principal." *Quirk v. Raymond Heard, Inc.,* 222 La. 46, 62 So.2d 96, 98–99 (1952).

A person dealing with a corporation is charged with notice of the limitations on the corporation's agents "and is generally bound to know whether or not the person who presumes to represent the corporation and act in its name is authorized to do so." *Carey Hodges Assoc., Inc. v. Continental Fid. Corp.,* 264 So.2d 734, 736 (La.App. 1st Cir.1972); *see also Buckley v. Woodlawn Development Corp.,* 233 La. 662, 98 So.2d 92, 98 (1957) ("Whoever deals with an agent is put on his guard by the very fact and *does so at his risk. It is his right and duty to inquire into* and ascertain the nature and extent of the powers of the agent and to determine whether the act or contract about to be consummated comes within the province of the agency and will or not bind the principal [emphasis added]." (Quoting *Chaffe v. Stubbs,* 37 La.Ann. 656, *in turn citing Natchitoches Motor Co. Inc. v. Campbell,* 17 La.App. 425, 136 So. 133 (1931)).

---

**10.** Article 2996 states: "A mandate conceived in general terms, confers only a power of administration. If it be necessary to alienate or give a mortgage, or do any other act of ownership, the power must be express."

Article 2997 states in relevant part: "Thus the power must be express for the following purposes: To sell or to buy.... and in general where things to be done are not merely acts of

administration, or such as facilitate such acts...."

Article 3010 states: "The attorney can not go beyond the limits of his procuration; whatever he does exceeding his power is null and void with regard to the principal, unless ratified by the latter, and the attorney is alone bound by it in his individual capacity."

The burden of establishing the authority of an agent to act for its principal falls on the party seeking to enforce the contract signed by that agent. *Buckley v. Woodlawn,* 98 So.2d at 99; *see also North American Sales Alliance, Inc. v. Carrtone Laboratories, Inc.,* 214 So.2d 167, 172 (La. App. 4th Cir.1968). This is especially so where the officer is exercising authority which exceeds simple day-to-day management of the business, as in the instant matter. *Id.; see, e.g., Tedesco v. Gentry Development, Inc.,* 521 So.2d 717, 723 (La. Ct.App. 2d Cir.1988), *cert. granted,* 523 So.2d 1313 (La.1988) ("[T]he power to sell real property is not a mere act of administration.").

As a result, in order for G.S. to establish that Worden bound MFP to the interlineated Exploration Agreement, G.S. has the burden of proving that Worden was expressly granted the alleged authority in writing. *See Morvant v. Arnoult,* 490 So. 2d 549, 551 (La.App. 4th Cir.1986); *Ward v. Pennington,* 434 So.2d 1131, 1137 (La.App. 1st Cir.1983). G.S. has not met its burden.

Worden's express grant of authority, publicly recorded (*see infra* n. 11), was in fact limited to contracts, agreements or other instruments affecting no more than 1,000 acres. (Ex. 2). The interlineated Exploration Agreement and the Wilcox Letter covered approximately 3,360 acres of M.F. P.'s acreage in Sections 4–10, Township 8 North, Range 3 West, Grant Parish, Louisiana. As a result Worden lacked the requisite express, written grant of authority to execute or alter the Exploration Agreement.

Aside from having record notice, G.S. was put on notice indirectly of Worden's limited authority when John D. Mullens, M.F.P.'s president and a total stranger to the underlying negotiations, signed the Exploration Agreement on behalf of M.F.P. Ogden conceded having noticed that the original Agreement was signed by Mullens and that Worden merely appeared as a witness to the instrument. (Tr. at 74, 192; *see* Ex. 6; *see also* Tr. at 374). G.S. also received a letter from Worden which explicitly identified Mullens' signature as that of M.F.P.'s president. (Tr. at 190–91; Ex. 8). Therefore, it is abundantly clear that G.S. did not satisfy its duty to inquire into and ascertain the nature and extent of Worden's authority. *See Buckley,* 98 So.2d at 98; *Bamber Contractors, Inc. v. Morrison Engineering & Contracting Co., Inc.,* 385 So.2d 327, 330 (La.App. 1st Cir.1980). Based on the above discussion this Court concludes that G.S. failed to satisfy its burden of establishing that Worden was expressly authorized in writing to enter into the interlineated Exploration Agreement and the Wilcox Letter on behalf of M.F.P.[11]

### (2) Apparent Authority

Although early Louisiana case law states that unauthorized acts of corporate officers are null and void, more recent authority holds that such unauthorized acts are merely voidable by a party to the contract. *Compare Standard Oil Co. of New Jersey v. Evans,* 218 La. 590, 50 So.2d 203, 206 (1950) and *Louisiana Sulphur Mining Co. v. Brimstone R. & Canal Co.,* 143 La. 743, 79 So. 324 (1918) and *Brantley v. Tugwell,* 68 So.2d 793, 795 (La.App. 2nd Cir.1953); *with Bolding v. Eason Oil Co.,*

---

**11.** It is also noteworthy that Worden's limited grant of authority was recorded in the public records of Grant Parish Louisiana. The Louisiana Supreme Court held that fact to be a sufficient basis upon which to charge all third parties with knowledge of the information revealed by that recorded document. *Standard Oil Co. of New Jersey v. Evans,* 218 La. 590, 50 So.2d 203, 206 (1950). As a result, G.S. may be charged with constructive knowledge of Worden's grant of limited authority.

G.S. contends that the indices of the public records of Grant Parish, Louisiana do not properly list Worden's limited authority. However a review of the "reverse" index under the name "Worden" clearly lists the power of attorney. (Ex. 3). In addition, Louisiana courts have held that indices do not constitute a part of the public records. *Central Lumber Co. v. Whittington,* 12 La.App. 695, 127 So. 79, 80 (1930); *Delerno v. Coastal States Gas Producing Co.,* 429 So.2d 183, 191 (La.App. 1st Cir.1983). Counsel for G.S. conceded this point. (Tr. at 1394). This reasoning serves as an additional basis for this Court to conclude that G.S. was, at a minimum, on constructive notice of Worden's limited grant of authority, and that G.S. therefore acted at its peril.

248 La. 269, 178 So.2d 246, 250 (1965) and *Tedesco* 521 So.2d at 723 and *Morvant,* 490 So.2d at 551.[12] G.S. acknowledges that Mullens, M.F.P.'s president, did not sign or initial the interlineations added to the Exploration Agreement by Worden. G.S. however contends that Worden had apparent authority to enter into and alter the Agreement on behalf of M.F.P., and therefore that the President's signature was not required.

"Apparent authority is a principal of estoppel, which operates in favor of third persons seeking to bind a principal to an unauthorized act of an agent." *National Bank of Bossier City v. Nations,* 465 So.2d 929, 933 (La.App. 2d Cir.1985).

The party seeking to bind the principal has the burden of proving apparent authority. *Byles Welding & Tractor, Inc. v. McDaniel,* 441 So.2d 48, 50 (La.App. 3d Cir.1983). The two prerequisites to such a finding are:

'(1) The principal must make some form of manifestation to an innocent third party; and,

(2) The third party must rely reasonably on the purported authority of the agent as a result of the principal's manifestations.'

*Id.,* (quoting *Pargas, Inc. v. Estate of Taylor,* 416 So.2d 1358 (La.App. 3d Cir.1982)).

G.S. seeks to have this Court find that Worden was cloaked with apparent authority. To support its argument it relies upon three Louisiana state court opinions which recognized the apparent authority doctrine as an exception to the express authority requirement, where the subject in controversy was a real estate transaction. *See Ideal Savings & Homestead Assoc. v. Kerner,* 208 La. 513, 23 So.2d 200 (1945); *Spiers v. Seal,* 426 So.2d 631, 634–35 (La.App. 1st Cir.1982); *Greenleaf Plantation, Inc. v. Kieffer,* 403 So.2d 100, 102–03 (La.App. 3d Cir.1981).

Each of these three decisions is critiqued in a very recent Louisiana State Court of Appeals opinion, which also addressed the apparent authority issue in the context of transferring immovable property. That opinion states: "Examination of the applicable civil code articles and the jurisprudence leads us to conclude that the doctrine of apparent authority is inappropriate in the realm of sales and mortgages of real estate." *Tedesco v. Gentry Development, Inc.,* 521 So.2d at 724. In reaching this conclusion, *Tedesco* criticized each of the three opinions noted above and relied upon by G.S. for the proposition that the apparent authority doctrine is applicable herein.

Commenting on *Kerner* the Court in *Tedesco* stated:

Its opinion [*Kerner*] is a lavish exposition of apparent authority doctrine and jurisprudence, omitting any mention of articles 2996 and 2997 [ (*see supra* n. 10) ]. On closer examination, however, certain undeveloped facts support the result, if not the stated rationale, in *Kerner.* The homestead's directors had hired the real estate agent and apparently followed his progress for over a year. Furthermore, the court said, "The plaintiff's own evidence makes it doubtful whether the Board of Directors did not pass a resolution authorizing the president to sign ..." 23 So.2d at 201. These remarks suggest that there really was full consent and a written mandate. There was full knowledge in that the homestead attorney who examined the title and prepared the sales documents was a member of the board of directors. The court also mentioned that the homestead failed to attack the fraudulent sale for over a year, in spite of regular internal and State audits which should have revealed the scheme, thus indicating a sort of ratification. Finally, there was an otherwise very strong case of apparent authority.

*Id.* at 722 (quoting *National Bank of Bossier City v. Nations,* 465 So.2d 929, 936 (La.App. 2d Cir.1985)).

---

**12.** Based on the ultimate ruling reached in the instant opinion, the issue of whether such unauthorized acts are truly null and void, or merely voidable, need not be resolved herein. In its analysis this Court has applied the standard most favorable to G.S. which is the "voidable" standard set forth in the more recent authority.

In addressing *Spiers,* the second decision relied upon by G.S., the *Tedesco* Court stated:

> The court enforced the contract on a theory of apparent authority. We think this result was fair because neither Clyde nor Edward [the sole shareholders, directors and officers of Seal Lumber] denied their corporate intent to sell. Intent was expressed by a listing agreement, signed by Clyde, and a sales offer, signed by Edward as president; *thus there was written consent from all shareholders, directors and officers, in compliance with article 2997* [emphasis added]. Furthermore, there was a subsequent "Agreement to Purchase" signed by both Clyde and Edward. This operates as a ratification. Finally, there was the guileless attempt to recede, which was patently arbitrary. Under these circumstances, we think the result was correct. *We cannot subscribe, however, to our brethren's broad language under headnotes 5 and 6, to the effect that apparent authority is an "obvious" exception to article 2997. Such a reading would emasculate that article.*

*Id.* (quoting *Nations,* 465 So.2d at 937).

In commenting on *Greenleaf,* the third decision relied upon by G.S., the *Tedesco* Court noted that the deciding panel of judges were divided (2–1–2). *Id. Tedesco* concluded that the application of apparent authority, on the facts presented in that case, was improper. *Id.* at 722–23. Instead, the *Tedesco* Court approvingly cited the *Greenleaf* dissent. *Id.* at 723.

Based upon the preceding analysis and the persuasiveness of the *Tedesco* opinion, this Court concludes that the apparent authority doctrine is inapplicable to the instant proceeding. Nonetheless, even if the reasoning of the three cases relied upon by G.S. was applied in support of its apparent authority allegation, this Court finds the facts of those cases distinguishable from the facts underlying the instant proceeding, thereby precluding a finding herein of apparent authority.

Most noteworthy is the fact that both *Spiers* and *Greenleaf* involved corporations each owned entirely by two shareholders. *See Spiers,* 426 So.2d at 633; *Greenleaf,* 403 So.2d at 101. Those two entities transacted business with an intimacy unique to small corporations. G.S. on the other hand should have anticipated that M.F.P., as the wholly owned subsidiary of a large, public corporation, would more closely adhere to corporate formalities.

G.S. nonetheless raised the following arguments in support of its contention that Worden was cloaked by M.F.P., with the apparent authority to enter into the interlineated Exploration Agreement:

(1) Although Worden did report to M.F. P.'s president John Mullens, Worden allegedly would only do so when something came up which was beyond his authority. This alleged autonomy is highlighted by the contention that Worden's seniors had little or no oil and gas experience. In addition, during the negotiations between M.F.P. and G.S., Worden was "Exploration and Mineral Manager" and thereafter became "Director, Energy Resources." G.S. contends that this purported autonomy, and these titles, induced G.S. to conclude that Worden was clothed with the authority to amend and execute the Agreement.

Ogden's asserted understanding that Worden was "the man who was in charge of Manville's operations ..." was based on telephone conferences and two meetings with him, not on any actual inquiry of others into the extent of Worden's authority (Tr. at 72–73). "A third party seeking benefits from the apparent authority doctrine may not have blindly relied on the assertions of an agent. One dealing with an agent, by the mere fact of agency, is given the right and duty to determine, at his peril, whether the agency purportedly granted by the principal will permit the proposed act by the agent." *Bamber Contractors, Inc.,* 385 So.2d at 330 (La.App. 1st Cir.1980); *see also Carey Hodges Assoc., Inc.,* 264 So.2d at 736. In fact, Ogden and Price conceded that they did not even satisfy their duty to inquire into the extent of

Worden's authority.[13] (Tr. at 74–75, 197, 374–75). Accordingly, this Court does not find Ogden's and Price's unwarranted and unreasonable understanding as to the extent of Worden's authority to be a sufficient basis upon which to make a finding of apparent authority.[14]

■ (2) The second argument raised by G.S. is that M.F.P. should be estopped from asserting the lack of authority defense because: (a) it was raised long after G.S. performed its obligations under the Agreement; and (b) it was asserted only after G.S. spent millions of dollars on the project.

The fact that M.F.P. did not immediately raise the lack of authority defense, does not preclude it from successfully asserting it. *See Carey Hodges,* 264 So.2d at 735 ("Cheek expressed great surprise at the amount of this bill. When it was presented subsequently to Mr. Lynch, president of defendant corporation, he, too, questioned the amount of the bill, but did not reject it. *Only later did Lynch, as president of defendant corporation, deny that Cheek had the authority to sign any such contract for defendant corporation."* Nonetheless, the Court found the contract to be unenforceable, basing its decision on the lack of authority defense, even though it was not immediately asserted.).[15]

Similarly, G.S.'s reliance argument, based on its alleged expenditure of funds which it claims it would not have spent but for its anticipated right to the Wilcox, is also unavailing. The evidence establishes that the sums were expended pursuant to the other provisions of the Exploration Agreement and not merely in anticipation of drilling into the Wilcox.

**13.** Ogden testified: "there was no reason for me to question his [Worden's] authority. Besides, when you're trying to deal with a person, you're not going to try to offend them. I'm not going to say to him ... Do you have the authority to make this deal with me? He might throw me out of his office...." Gulf States' Reply brief at 9 n. 3 (quoting Tr. at 74–75).

In response to the question "Did Gulf States ever do anything to check to see what authority Don Worden had?" Price testified, "No." (Tr. at 374–75).

Price's failure to inquire into the extent of Worden's authority is made more curious after noting her responses in the following transcript excerpts from the instant trial: "Q: Do you remember when we took your deposition previously in this matter on January 29, 1986, when I was asking you certain questions, that you said you knew what your limits of authority were? Price: Yes. Q: So you were aware of what you could or could not do on behalf of Gulf States? Price: Yes. Q: And you didn't question what Mr. Worden could or could not do on behalf of Manville? Price: Mr. Worden didn't question me either." (Tr. at 375–76).

In fact G.S.'s Original Post–Trial Brief concedes "Gulf States never asked Don Worden whether he had the 'authority' to agree to the exploration agreement." Gulf State's Original Post Trial Brief at 91.

**14.** The following opinions support this conclusion: *see Pargas, Inc. v. Estate of Taylor,* 416 So.2d 1358 (La.App. 3d Cir.1982) ("Defendant Rapides Bank also contends that Taylor had the apparent authority to conduct the banking transactions involved on behalf of Pargas. In support thereof Rapides Bank emphasizes Taylor's managerial status, with its accompanying duties, and his use of the rubber stamp. How-ever, it is well established that the mere fact that an employee has managerial status and is in charge of a company's office does not entitle third persons to assume·that he has authority to execute or endorse negotiable paper belonging to his employer." (citing *Guillory v. Braswell Motor Freight Lines, Inc.,* 256 So.2d 646 (La.App. 2nd Cir.1972), writ ref. 260 La. 1134, 258 So.2d 381 (1972)); *see also Marsh, Inv. Corp., v. Langford,* 490 F.Supp. 1320, 1327 (E.D.La.1980), *aff'd.,* 652 F.2d 583 (5th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982) ("not even Carlos Marcello himself, or any officer of Marsh for that matter, could have validly executed these mortgages, because *even though the corporation usually followed Marcello's recommendations, he was not expressly authorized by resolution to take such action in the name of the corporation* [emphasis added]."); *see also Carey Hodges Assoc., Inc. v. Continental Fid. Corp.,* 264 So.2d 734, 736 (La.App. 1st Cir. 1972) ("Although the plaintiff-appellant had dealt almost exclusively with Richard Cheek in its negotiations concerning work for defendant corporation and believed him to be acting as an agent for defendant, the record is devoid of any evidence which would justify appellant in relying upon Mr. Cheek as being properly authorized to contract with the plaintiff concern...."). The instant record is similarly devoid of evidence warranting a finding of apparent authority.

**15.** To the extent that *Greenleaf,* would appear to reach an opposite conclusion, it is distinguishable on its facts. 403 So.2d at 104. Specifically, as noted in the paragraph of text following this footnote, the elements of detrimental reliance and unfair advantage are not present in the instant matter.

Additionally, it is noteworthy that before August 1982, even though it had legal counsel, G.S. did not solicit any legal opinion as to the effectiveness of the agreement. (Tr. at 77, 116–17, 187–88, 390).

(3) For its third argument, G.S., citing *Greenleaf* 403 So.2d 100, contends that nowhere does M.F.P. allege that it would not have authorized the amendments had they been brought to its attention. (Tr. at 1395). This contention is more than counterbalanced by the fact that M.F.P. customarily separated out the Wilcox from any grant of mineral rights. (*See* Worden Deposition ("Dep.") Tr. at 41; *see also*, Tr. at 1271). In addition, this allegation by G.S. is an insufficient basis upon which to conclude that Worden had the apparent authority to amend the Exploration Agreement.

As a result of the discussion above it is clear that, even were this Court to conclude that the apparent authority doctrine is applicable to the instant proceeding, G.S. failed to meet its burden of satisfying the doctrine's prerequisites.

The remaining three arguments raised by G.S. relate to actions which occurred after the interlineated Agreement was initialed, and accordingly they go to the issue of whether M.F.P. ratified the interlineated Exploration Agreement. *See Bamber Contractors, Inc.*, 385 So.2d at 331. The ratification issue is discussed immediately below.

B. *The fact that M.F.P. and G.S. operated under the Agreement for 18 months without protest does not amount to ratification by M.F.P. of the interlineations and the Wilcox letter.*

■ Both parties concede that the unauthorized act of a corporate agent may be ratified. *See Tedesco* 521 So.2d at 723; *Fejta v. GAF Companies, Inc.*, 800 F.2d at 1396; *Daigle & Assoc., Inc. v. Coleman*, 385 So.2d 349, 350 (La.App. 1st Cir.1980), *aff'd*, 396 So.2d 1270 (La.1981). Ratification "is the adoption by one person of an act done on his behalf by another without authority." *Bamber Contractors, Inc.*, 385 So.2d at 331. "The burden of proving ratification is on the party asserting it." *Id.; Rebman v. Reed*, 335 So.2d 37 (La.App. 4th Cir.1976), *cert. denied*, 338 So.2d 699 (La.1976). No intent to ratify will be inferred when the purported ratification can be otherwise explained. *Bamber Contractors Inc.*, 385 So.2d at 331 (citing *Nationwide Finance Co. of Gretna, Inc., v. Pitre*, 243 So.2d 326 (La.App. 4th Cir.1971)). Instead, the intent to ratify must be clear and absolute. *Id.*

Louisiana Civil Code Article 2272, in effect at all times pertinent to the instant dispute, addresses ratification. That article states in relevant part:

> The act of confirmation or ratification of an obligation, against which the law admits the action of nullity or rescission, is valid only when it contains [1] the substance of that obligation, [2] the mention of the motive of the action of rescission, and [3] the intention of supplying the defect on which that action is founded.

La.Civ.Code Ann. art. 2272 (West 1973) (current version at art. 1842, 1843, 1844).

The United States Court of Appeals for the Fifth Circuit, applying Louisiana law, addressed the issue of whether ratification of a contract to purchase immovable property had to be written. *Fejta v. GAF Companies, Inc.*, 800 F.2d 1395 (5th Cir. 1986). That opinion states:

> 'a contract entered into by an agent, though voidable for lack of authority to act, may be ratified by the principal.' *Daigle & Assoc., Inc. v. Coleman*, 385 So.2d 349, 350 (La.App. 1st Cir.1980) (citations omitted). 'It has been held that an agreement to purchase affecting immovable property can be *ratified only in writing* [ (emphasis added) ].' *Id.* (citing *Krupp v. Nelson*, 50 So.2d 464 (La.Ct. App.1951)). In the instant case there was no written ratification of the contract to sell. Because Fejta was not authorized in writing to act as Mentel's agent in transacting the sale, and because Mentel did not ratify the contract to sell in writing … the contract to sell was unenforceable.

\* \* \* \* \* \*

Because no writing was entered into evidence either authorizing Fejta to act as Mentel's agent in transacting the sale or ratifying the contract ... we find that under Louisiana law the contract to sell was unenforceable.

*Id.* at 1396–97. Although the instant case involves the leasing of mineral rights underlying immovable property, the above quoted rationale is equally applicable herein. *See* La.Rev.Stat.Ann. tit. 31 § 16 (West 1975).

In support of its argument that M.F.P. did ratify the Agreement as amended, in writing, G.S. points out that the interlineated Agreement was listed in M.F.P.'s schedule of executory contracts filed with this Court in February 1983, and that M.F.P. took no steps to reject it. (Ex. 125). As a preliminary matter, although it is a writing, the list of executory contracts does not meet the specificity requirements of an express ratification under Article 2272.

In addition, listing the Agreement in a schedule of executory contracts does not rise to the level of a clear and absolute intent to ratify. *See generally Bamber Contractors, Inc.*, 385 So.2d at 331; *Nationwide Finance Co.*, 243 So.2d 326. Moreover, the interlineated Agreement already expired by the time the schedule of executory contracts was filed, due to G.S.'s failure to provide for the continuous 120 day drilling program required under the Agreement. (*See* Ex. 119). Accordingly, M.F.P. had no obligation to reject it. Therefore, based upon the absence of a written ratification, the instant disputed Agreement may not be found to have been ratified.

■ G.S. also raises a number of arguments in an attempt to support a finding of implied ratification. In advancing this position G.S. refers to Louisiana Civil Code Article 1843 which amended Article 2272, effective January 1, 1985.

Article 1843 states in relevant part: "An express act of ratification must evidence the intention to be bound by the ratified obligation. *Tacit ratification results when a person, with knowledge of an obli-*

*gation incurred on his behalf by another, accepts the benefit of that obligation* [ (emphasis added) ]." La.Civ.Code Ann. art. 1843 (West 1987). G.S. points out that the comments to this amended section state, "[t]his Article is new, but it does *not change the law* [ (emphasis added) ].... 'Ratification will occur when the principal, knowing of the contract, does not repudiate it but accepts its benefits.' " (citing *Bamber Contractors, Inc. v. Morrison Engineering and Construction Co., Inc.*, 385 So.2d at 331).

It is noteworthy that the *Bamber* opinion dealt with the rental of earth moving equipment, not immovable property. *Bamber*, 385 So.2d at 328–29. Accordingly, it is factually distinguishable from the instant matter.

In the *Tedesco* opinion, which was rendered subsequent to the above noted amendment, the Louisiana Court of Appeals for the Second Circuit held:

"there is also support in the jurisprudence for the proposition that a *ratification* of a sales agreement on *immovable* property executed by an agent *must likewise be in writing* [ (emphasis added) ]. *Krupp v. Nelson*, 50 So.2d 464 (La.App. 4th Cir.1951); *Daigle & Assoc., Inc. v. Coleman*, 385 So.2d 349 (La.App. 1st Cir.1980), affirmed on other grounds, 396 So.2d 1270 (La.1981); *Fejta v. GAF Companies, Inc.*, 800 F.2d 1395 (5th Cir. 1986). In the absence of an express and written mandate to sell immovable property on behalf of the corporation, or a ratification by the corporation, Gentry could not be bound by the contract...."

*Tedesco*, 521 So.2d at 723–24.

Accordingly, this Court concludes that in order to be effective, the ratification must be written. This conclusion precludes a finding that the interlineated Agreement was ratified.

■ Even were this Court to assume, without so deciding, that a written ratification was not required, G.S. failed to satisfy its burden of establishing an im-

plied ratification.[16]

In support of its contention that there was an implied ratification, G.S. notes that M.F.P. executed *320*–acre mineral leases to G.S. for non-Wilcox depths of the No.1, A–1 and B–1 wells. The original Exploration Agreement called for granting *160*–acres leases, and it was only the interlineated Agreement which provided for granting the larger leases. Therefore G.S. argues that M.F.P.'s granting of *320* acre leases amounts to an acknowledgement by M.F.P. of *all* the terms of the interlineated Agreement, including a grant of the Wilcox rights. This is especially so, according to G.S., because long before the alleged breach, M.F.P. was receiving royalties under these 320 acre leases.

The No. 1, A–1 and B–1 wells are each deep wells located in the Mooringsport Formation. Rights to the Mooringsport were properly granted to G.S. because they, unlike the Wilcox rights, were *included* in the *original* Exploration Agreement which was signed by Mullens, who was properly authorized to do so on behalf of M.F.P. Accordingly, G.S. was properly granted the rights to the Mooringsport by an authorized agent of M.F.P. In turn, Worden as an agent of M.F.P. authorized to grant leases of up to 1,000 acres, could permissibly grant the subject *320* acre leases within that Formation.

The Wilcox Formation on the other hand was explicitly excluded from the original Exploration Agreement as signed by Mul-lens. Since the Wilcox Formation was not leased to G.S. by a duly authorized agent of M.F.P., Worden was not authorized to grant any individual Wilcox leases to G.S. Therefore, the granting of *320* acre leases for the No. 1, A–1 and B–1 wells did not amount to an acknowledgement of the interlineated Agreement, but instead was in accordance with Mullens' authorized lease of the Mooringsport rights, combined with Worden's grant of leases which did not exceed his 1,000 acre delegation.

G.S.'s argument, that M.F.P.'s receipt of royalties from the *320* acre leases supports a finding of implied ratification, is similarly unavailing. All royalties received by M.F.P. from G.S. were paid in accordance with the terms of the "deep leases" covering the Mooringsport Formation. No royalties were to be paid under the Exploration Agreement and no royalties were paid by G.S. to M.F.P. on any Wilcox production. (*See* Volume entitled MFPC/Donner Leases).

The closest G.S. comes to establishing that the interlineated Agreement was ratified by an authorized agent is the submission of the deposition testimony of Roger J. Krapfl. However, that testimony only establishes Krapfl's knowledge of the interlineated Agreement subsequent to G.S.'s filing of its claim. In addition, Krapfl was only authorized to handle property not exceeding 3,000 acres, and as noted the Wilcox covers a larger area. (Ex. 177).

---

**16.** G.S. cited the following factually distinguishable cases in support of the proposition that the instant ratification may be implied:

*Bolding v. Eason Oil Co.,* 248 La. 269, 178 So.2d 246, 250 (1965) (The lease in that case represents the requisite writing.) *Sanchez v. Sanchez,* 464 So.2d 1009, 1012 (La.App. 1st Cir. 1985) (The Court found an *implied* ratification on grounds inapplicable to the instant case. Specifically, the Court stated "the clear language of the Civil Code allow[s] implied ratification by minors upon reaching majority. LSA C.C. art. 1785, LSA C.C. art. 1875, LSA C.C. art. 2228."). No such explicit exception is applicable to the instant matter.

*Cato v. Bynum,* 98 So.2d 257 (La.App. 1st Cir.1957) (This case involved a very narrowly tailored exception to the general rule governing ratification, and it should be limited to its facts. The Court in that case stated: "we are wholly in accord with the number of cases which hold that title to real property must be transferred in writing, and that community property cannot be transferred without the signature or written consent of the husband...." *Id.* at 259. Nonetheless, the Court recognized an implied ratification where: 1) the purchaser was unsophisticated; 2) the husband was instrumental in arranging the sale and was present at its execution; 3) he shared in the consideration from the sale; and 4) upsetting the sale would take the property out of the hands of a third party).

G.S. also argues that the fact the M.F.P.'s only copy of the Agreement on file, was the interlineated copy, is another factor to consider in finding an implied ratification, (citing *Flaherty v. Gulfco Life Insur. Co.,* 327 So.2d 436 (La.App. 3rd Cir.1976). However, that case did not involve immovable property and accordingly is distinguishable on its face.

Therefore, this Court concludes that G.S. failed to establish the existence of a valid written, or even an implied, ratification. Accordingly, absent any ratification as well as any express or even apparent authority on the part of Worden, we hold that the interlineated Agreement is not enforceable by G.S. and therefore G.S.'s claim should be expunged in its entirety.

C. *Even assuming a ratification, under the Wilcox letter M.F.P. remained free to grant Wilcox leases to third parties, until G.S. had complied with the obligations of the Wilcox letter and requested a Wilcox lease.*

■ Even if G.S. was able to establish a ratification, and even were this Court to then find that the interlineated Agreement and the Wilcox Letter were two components of a single ratified agreement,[17] this Court nonetheless would have to conclude that M.F.P. did not breach its terms by leasing the Wilcox to a third party.

The terms of the Wilcox Letter salient to the instant issue read: "in the event that you [a] drill a well or wells upon the property covered by said Exploration Agreement or upon property unitized with said property and [b] log the Wilcox Formation then [c] upon your written request and [d] receipt of a copy of said log, we will grant to you without the payment of any consideration a separate lease upon ... all our *unleased and uncommitted* mineral interests in the governmental quarter section upon which the well in question which has been drilled by you is located [ (emphasis added) ]." (Ex. 17).

M.F.P. contends that pursuant to the language of the Wilcox Letter, G.S. was only entitled to the Wilcox rights if the Formation was "unleased and uncommitted" as of the date G.S. requested a lease. M.F.P.'s understanding therefore is that the language afforded it the freedom to commit the acreage to a third person up until the time that G.S. requested a lease, which could only occur after G.S. met all the prerequisites stated in the Wilcox Letter.

G.S. on the other hand argues that the phrase "unleased and uncommitted" contemplated that M.F.P. would hold the Wilcox acreage "unleased and uncommitted" as of February 11, 1981, for potential conveyance to G.S. Thus, G.S. contends that it would not have entered into an agreement which required it to drill a deep well and incur extensive expenses before requesting a Wilcox lease, only to find out that the shallower Wilcox is no longer available. Accordingly, G.S. alleges that M.F.P. had no right to subsequently commit and lease the Wilcox to a third party. This argument is unpersuasive given the fact that the entire exploration program was essentially geared to deep drilling.

As a fall back position, G.S. responds that even were it to assume that M.F.P.'s position is correct, the Wilcox was not committed and leased to anyone else as of August 4, 1982, the date G.S. requested a Wilcox lease from M.F.P. Accordingly G.S. concludes that M.F.P. breached the terms of the Wilcox Letter.

Where the language of a contract is ambiguous a court may consider parol evidence in order to determine the intent of the contracting parties. *Moreau v. Otis Elevator Co.*, 531 F.2d 311, 313 (5th Cir. 1976); *Capizzo v. Traders & Gen. Ins. Co.*, 191 So.2d 183, 187 (La.App. 3d Cir.1966); *see* La.Civ.Code Ann. art. 2276 (West 1973) (current version at art. 1848). In light of what may be an ambiguity, the Court will consider parol evidence.

M.F.P. points to G.S.'s conduct, particularly its reaction to a letter from Donner Properties regarding entitlement to the Wilcox, to support its interpretation of the Wilcox Letter. Donner Properties originally sent a letter to G.S. containing language identical to that appearing in the Wilcox Letter. (*See* Ex. 21). Pursuant to the terms of that letter G.S. sought the Wilcox rights from Donner Properties. Although

---

**17.** A preliminary issue briefed by the parties is, assuming a ratification, what in fact was ratified, the interlineated Agreement or the Wilcox Letter? Solely for the purposes of this argument, this Court will assume that the two documents were components of a single contract, which is the position most favorable to G.S.

Donner Properties originally granted G.S. a Wilcox lease, it subsequently informed G.S. that all remaining Wilcox rights were committed to Hogan Exploration, pursuant to a Florida Exploration Company Agreement. (*See* Ex. 104). This notice did not elicit any protest from G.S.[18] (*See* Tr. at 635, 636). This is quite different from G.S.'s response to M.F.P.'s refusal to grant Wilcox rights, which resulted in the instant action.

It is also noteworthy that although bound by terms identical to those appearing in the Wilcox Letter, Bill Oliver acting for Donner Properties, like Worden acting for M.F.P., interpreted the Letter as permitting Donner to grant the Wilcox rights to a third party, as long as there had been no such prior request by G.S.. (*See* Tr. at 1243–44).[19]

Indeed, G.S.'s stated interpretation of the phrase "unleased and uncommitted" is unreasonable when contrasted with their actions subsequent to receiving the Wilcox Letter. Ogden contends that pursuant to the Wilcox letter G.S. was entitled to a Wilcox lease covering all mineral interests which were uncommitted as of February 11, 1981. Yet, Ogden waited over one year until he inquired into what in fact was unleased and uncommitted. (Tr. at 182). Accordingly, although Ogden testified that the Wilcox was essential to the instant transaction, his actions belie that contention. (*See* Tr. at 186, 347–48). This serves

to further undermine Ogden's interpretation of the phrase "unleased and uncommitted" as it appears in the Wilcox Letter.

M.F.P. in fact transferred the Wilcox rights to Hogan pursuant to a June 1982 verbal commitment to Hogan which predates G.S.'s written request to M.F.P. for a Wilcox lease. The fact that this agreement was not reduced to a writing until two months after it was entered into does not undermine M.F.P.'s position. Louisiana Civil Code Article 2275 states:

> Every transfer of immovable property must be in writing; but if a verbal sale, or other disposition of such property, be made, it shall be good against the vendor, as well as against the vendee, who confesses it when interrogated on oath, provided actual delivery has been made of the immovable property thus sold.

La.Civ.Code Ann. art. 2275 (West 1973) (current version at art. 1832 & 1839).

Article 2276 states: "Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since." La.Civ.Code Ann. art. 2276 (West 1973) (current version at art. 1848).

Both Worden and Meredith testified that a verbal commitment to Hogan was made in June 1982. (Worden Dep. Tr. at 56–58; Tr. at 1274–83). This testimony was con-

---

**18.** Ex. 104 is an October 15, 1982 letter from Bill Oliver, Manager of Donner Properties to Ogden, That letter states: "Donner entered into an exploration agreement with Florida Exploration Company on October 1, 1981. This contract covered all Donner's unleased minerals under the former Brown Paper Mill lands in North Louisiana. In addition to the above agreement, Florida entered into an exploration farmout agreement with Hogan Exploration covering all of the Wilcox rights under the properties covered in Donner's agreement. As a result of legal complications that have arisen due to these agreements, please be advised that all of Donner's Wilcox rights as defined in our letter to you of February 19, 1981 are now committed and we will be unable to grant any new Wilcox leases."

**19.** Bob Oliver, who has no stake in the outcome of this proceeding, testified as follows:
"A. [by Bob Oliver, consultant to Donner] I understood ... this [Wilcox] letter to say that since the Wilcox rights had been reserved in the

basic agreement with Gulf States, that in view of a request by J.C. [Ogden] to include the Wilcox rights, we agreed to include the Wilcox rights under all of the property involved in the big agreement or the original agreement, provided that—that we did not—that we would grant a lease if, at the time a well was drilled by Gulf States, the Wilcox rights on the tract they were drilling was unleased or uncommitted, and—it was on that basis which we—I signed this letter and had the bank sign."
Q. Under your understanding of the letter agreement, on February—well, let's say March of 1981, a month or so after this letter went out, did you understand that Donner Properties would be free to commit the Wilcox or lease the Wilcox to somebody other than Gulf States?
A. Absolutely, yes, we would have done so had we had any opportunities to do so.
(Tr. at 1243–44).

firmed by Haddox. (Haddox Dep. Tr. at 28–29). Accordingly, all three witnesses agreed that a commitment had been made. Therefore, this Court concludes that the subject Wilcox rights were leased and committed prior to the time G.S. requested a Wilcox lease.[20]

### D. *G.S. cannot properly assert damages in excess of its filed proof of claim*

■ As noted, G.S. originally filed a $16,035,000 proof of claim against M.F.P.'s estate. G.S.'s complaint, which was filed after the claims bar-date, seeks $31,009,837 in its *ad damnum* clause. In effect, this amounts to an attempt by G.S. to recover more than $14,000,000 above and beyond the amount asserted in its original claim. M.F.P. seeks to cap its liability, if any, to the amount stated on G.S.'s filed proof of claim. *See* M.F.P.'s Answer at para. 74.

Congress intended the bar date in a chapter 11 case to be a mechanism providing the debtor and its creditors with finality. *See Hoos & Co. v. Dynamic Corp. of America,* 570 F.2d 433, 439 (2d Cir.1978); *Norris Grain Co. v. U.S. (In re Norris Grain),* 81 B.R. 103, 106 (Bankr.M.D.Fla. 1987). Accordingly, bar-dates are likened to statutes of limitations which must be "strictly observed." *In re Kay Homes, Inc.,* 57 B.R. 967, 971 (Bankr.S.D.Tex.1986).

"[T]he general rule [is] that when a claim is filed timely, amendments to that claim filed after the bar date are accepted as justice requires to permit the fair consideration of all claims." *In re City of Capitals,* 55 B.R. 634, 637 (Bankr.D.Md.1985) (citing *In re International Horizons, Inc.,* 751 F.2d 1213, 1216–17 (11th Cir.1985); *LeaseAmerica Corp. v. Eckel,* 710 F.2d 1470, 1473 (10th Cir.1983); *In re Commonwealth Corp.,* 617 F.2d 415, 421 (5th Cir. 1980); *In re Simms,* 40 B.R. 186, 188–89 (Bankr.N.D.Ga.1984); *In re International Home Design,* 28 B.R. 584, 586 (Bankr.W.

D.Mo.1983)). The determination of whether or not to permit a particular claim to be amended is left to the sound discretion of the Bankruptcy Judge. *In re Black & Geddes, Inc.,* 58 B.R. 547, 553 (S.D.N.Y. 1983).

Bankruptcy Judges should consider two factors in exercising their discretion:

> look first to whether there was a timely assertion of a similar claim or demand evidencing an intention to hold the estate liable. Generally speaking, an amendment will not be permitted if it amounts to an attempt to file an entirely new claim.... The court should also examine all of the facts of the particular case, and determine whether it would be equitable to allow the amendment.... Particularly significant to the latter inquiry are determinations of whether ... there is some justification for the movant's failure to file a proper claim within the limitations period. [Citations omitted].

*Id.*

Nowhere has G.S. provided any justification for the discrepancy between the amount asserted in its original, filed proof of claim, and the amount claimed in the *ad damnum* clause of its complaint. Accordingly, G.S.'s unexplained behavior "does not present an instance under which justice or fairness require the allowance of an amendment." *See International Horizons,* 751 F.2d at 1216 (citing *In re Miss Glamour Coat Co.,* 80–2 U.S.T.C. ¶ 9737 (S.D.N.Y. Oct. 8, 1980)).

Moreover, G.S. never even amended its proof of claim, nor did it seek an extension of time to do so. This factor is influential in this Court's determination that even were G.S. entitled to recover on its timely filed claim, that recovery would be limited to the sum listed on the face of that claim. *See In re Norris Grain,* 81 B.R. at 108–09.

---

**20.** G.S. also argues that Worden betrayed Ogden's trust by showing the log G.S. made of the B–1 well to Jim Haddox in May of 1982. (See Tr. at 29–30, 96. 239). This argument is of no merit in light of the fact that those logs were filed with the Louisiana Office of Conservation on June 9, 1982, less than one month after the May 16, drill date, and therefore were public knowledge. (Ex. 68; Tr. at 115, 1432; *see also* Tr. at 499, 1267–71). In addition, Ogden conceded that in making exploration plans he himself had relied upon a log which Worden had in his possession and had showed to him. (Ex. 5; Tr. at 58–59, 188).

However, even were this Court to recognize G.S.'s complaint as an informal motion to amend, or even an amended claim, in order "to be within the scope of a permissible amendment, the second claim should not only be of the same nature as the first but also reasonably within the amount to which the first claim provided notice." *In re AM International, Inc.,* 67 B.R. 79, 82 (N.D.Ill.1986). The $14,000,000 increase above the amount asserted in the proof of claim clearly brings this informal amendment outside the bounds of this standard.

These factors, considered cumulatively, support this Court's determination that, the outer bounds of G.S.'s damage claim is the $16,035,000 sum scheduled in its original filed proof of claim.[21]

E. *The instant proof of claim is solely in G.S.'s name, accordingly G.S. may only pursue it's proportionate interest, and may not assert the rights of the other working interest partners to any damages.*

■ M.F.P. also objects to G.S.'s proof of claim on the grounds that in addition to asserting G.S.'s interests, it improperly asserts the interests of the other working interest ("W.I.") partners. *See* M.F.P.'s Answer at para. 75. M.F.P. contends that, even were this Court to conclude that G.S. is entitled to damages for the alleged contract breach, G.S.'s claim should be solely limited to its percentage interest in the W.I. partnership.

As noted above, G.S. retained only a 39.0625% interest in the subject mineral leases, having assigned the balance of its interest to its four working interest partners. (*See supra,* discussion at 8; ex. 29–31, 38, Pre-Trial Order at 6). Those assignments were effected pursuant to letter agreements, between G.S. and its W.I. partners, which state in relevant part:

Gulf States subject to the provisions of this Letter Agreement, hereby *transfers and assigns* to Participant without warranty of title, an undivided [percentage] interest in and to the rights and interests acquired, and to be acquired by Gulf States, in and to the Oil, Gas and Mineral Leases, Farmout Agreements, and/or other agreements described in the Exhibit "A" hereof [emphasis added]....

(Ex. 29, 30, 31 & 38). Exhibit A specifically listed the M.F.P./Donner Exploration Agreement.

Of the five W.I. partners, only G.S. filed a proof of claim ("Claim") in this bankruptcy case.[22] G.S.'s Claim does not provide that it is appearing in any representative capacity whatsoever. Instead, the Claim asserts 100% of the asserted damages based upon the alleged breach, despite the fact that G.S.'s share in the mineral rights only approached approximately 40%.

Subsequent to the claims bar date of December 29, 1983, G.S. negotiated an agreement with its W.I. partners whereby G.S. would file an amended proof of claim on behalf of all of the W.I. partners, indicating their pro rata interest in the asserted claim. By August 21, 1984 such an agreement was executed, however no amended proof of claim of any kind was ever filed with the Court. (*See* Exhibits 157, 164, 169, 171 and 179). In addition, the complaint relating to this proceeding does not describe G.S. as appearing in a representative capacity, nor does it mention the W.I. partners. Nonetheless, according to G.S., the W.I. partners looked to it to protect their derivative interests in the contract with M.F.P. (G.S. Brief at 58).

---

**21.** In an attempt to quantify damages, both sides presented a substantial amount of testimony by professionals regarding potential reserves of oil, or the lack thereof. Although not necessary to our holding, having gauged the credibility of the witnesses, and the evidence presented as a whole on this issue, we conclude that even this estimation of approximately $16,000,000 is highly speculative.

**22.** Indeed, Ex. 171 clearly reveals that the W.I. Partners chose not to file a proof of claim. The relevant portion of the Exhibit reads:

The confidential memorandum was furnished to all Co–Claimants to provide to them the opportunity as co-investors in the New Verda Prospect Area to participate with Gulf States in the prosecution of the claim *inasmuch as no Co–Claimant had elected to file an individual Proof of Claim in the bankruptcy proceeding* [emphasis added]. (Ex. 171 at 2).

G.S. alleges that the Exploration Agreement it entered into with M.F.P. was concluded in February 1981, and that the Letter Agreements with the W.I. partners were not even in effect as of that time. Therefore, according to G.S., since it entered into the contract with M.F.P., in the event of a contract breach, M.F.P.'s sole recourse would have been against G.S., not the other W.I. partners. Reciprocally, G.S. contends that in the event of a breach, the W.I. partners would not have had separate legal claims against M.F.P. As a consequence, G.S. argues that the Claim it filed establishes beyond doubt that all damages attributable to the alleged breach by M.F.P. were properly sought by G.S. with the full prior knowledge and approval of the W.I. partners.

Pursuant to § 501 of the Code, a creditor may file a proof of claim against a debtor in a bankruptcy proceeding. 11 U.S.C. § 501. Fed.R.Bankr.P. 3001 and 3003, *inter alia*, govern the filing of claims in Chapter 11 cases. Rule 3001(b) provides that:

> A proof of claim shall be executed by the creditor or the creditor's *authorized* agent except as provided in Rules 3004 and 3005 [emphasis added].[23]

Fed.R.Bankr.P. 3001(b).

Rule 3001(e)(1) states in relevant part that if a claim has been unconditionally *transferred* before the proof of claim has been filed, then "the proof of claim may be filed only by the *transferee* [emphasis added]." Fed.R.Bankr.P. 3001(e).

The importance of the language of subsections (b) and (e)(1) of Bankruptcy Rule 3001, is that each individual *claimant* or *transferee* of an unfiled claim must file a proof of claim, or expressly authorize an agent to do so on its behalf. Rule 3001(b) allows a creditor to instruct an agent to file a claim on its behalf, but it does not allow an agent to file a proof of claim and subsequently inform the creditor of that fact. *In re Standard Metals Corp.*, 817 F.2d 625, 631 (10th Cir.1987), *modified*, 839 F.2d 1383 (10th Cir.1987).

Although not directly on point, *In re Electronic Theatre Restaurant Corp.*, addressed the issue of the allowability of a representative claim, with reasoning similarly applicable to the instant issue. *In re Electronic Theatre Restaurant Corp.*, 57 B.R. 147, 148–49 (Bankr.N.D.Ohio 1986). That Court held that only when an agent has express authorization may he file a proof of claim for another. *Id.* As a result, proofs of claims filed on behalf of others may be successfully expunged where the requisite authorization has not been established. *Id.; see also In re Standard Metals Corp.*, 817 F.2d at 631; *In re Johns–Manville Corp.*, 53 B.R. 346, 350–54 (Bankr.S.D.N.Y.1985). These holdings are equally applicable to the instant matter.

Moreover, pursuant to Fed.R.Bankr.P. 3001(a), all proofs of claims must substantially conform to Official Form No. 19. To the extent that the filing claimant is acting as an agent for a third-party creditor, Form 19 requires the agent to fill in the name and address of the claimant on whose behalf the claim is being filed. *See In re Electronic Theatre Restaurant Corp.*, 57 B.R. at 148. Nowhere does G.S. allege that it complied with this requirement.

In addition Fed.R.Bankr.P. 2019 in relevant part "requires that every person purporting to represent more than one creditor in a Chapter 11 reorganization case file a verified statement setting forth the names and addresses of the creditors, the nature and amount of the claims and the relevant facts and circumstances surrounding the employment of the 'agent.'" *In re Electronic Theatre Restaurant Corp.*, 57 B.R. at 148–49. Nowhere does G.S. allege that it filed the requisite verified statement, nor does its proof of claim provide that it is authorized to appear in any representative capacity on behalf of the W.I. partners. Indeed, G.S.'s only authorization to act on behalf of the W.I. partners arose well after the December 29, 1983 bar date and that authorization extended solely to filing an amended proof of claim which was never filed. Accordingly, G.S.'s Claim, to the ex-

---

**23.** Fed.R.Bankr.P. 3004 and 3005 in particular circumstances, permit the filing of claims on behalf of creditors by the trustee, debtor in possession, or a co-obligor.

tent that it seeks to assert claims on behalf of the other W.I. Partners, failed to satisfy the requirements of Bankruptcy Rules 2019 and 3001.

Subsections (c)(2) and (c)(3) of Fed.R. Bankr.P. 3003 provide:

(2) *Who Must File.* Any creditor or equity security holder whose claim or interest is not scheduled or scheduled as disputed, contingent, or unliquidated shall file a proof of claim or interest within the time prescribed by subdivision (c)(3) of this rule; any creditor who fails to do so shall not be treated as a creditor with respect to such claim for the purposes of voting and distribution.

(3) *Time for filing.* The court shall fix and for cause shown may extend the time within which proofs of claim or interest may be filed.

Fed.R.Bankr.P. 3003(c)(2), (c)(3).

G.S. and its W.I. Partners were not scheduled as creditors of M.F.P. Accordingly, the W.I. partners should have timely filed proofs of claims as a threshold requirement to having their claims allowed pursuant to the Rules. It is a clearly established rule of bankruptcy procedure that when a party fails to timely file a proof of claim due to a "chosen course of action and the circumstances were within the party's reasonable control, [then] the courts will not offer relief from the choice taken." *In re McCoy Management Services, In.,* 44 B.R. 215, 217 (Bankr.W.D.Ky.1984), *In re O.P.M. Leasing Services, Inc.,* 35 B.R. 854, 867 (Bankr.S.D.N.Y.1983), *modified,* 48 B.R. 824 (S.D.N.Y.1985). Debtor's mere knowledge of the creditor's claim has never been held to be sufficient to constitute an informal proof of claim. *In re Stern,* 70 B.R. 472, 476 (Bankr.E.D.Penn.1987).

Since none of the W.I. partners either filed a proof of claim or timely authorized G.S. to file it for them, G.S. cannot successfully assert claims on their behalf. As a result, even were this court to find that M.F.P. did breach its Agreement with G.S., (a finding this Court has not made), any recovery to G.S. would have to be reduced to equal its partnership interest (i.e. 39.0625%) in the total award.

## CONCLUSION

Based upon the preceding analysis, this Court concludes that M.F.P. fully sustained its objection to G.S.'s proof of claim for damages. Accordingly the proof of claim shall be and hereby is expunged.

IT IS SO ORDERED.